**15-1311**

# United States Court of Appeals for the Federal Circuit

Radio Systems Corp. and Innotek, Inc.,

*Plaintiff – Appellee,*

*v.*

Tom Lalor

*Defendant – Appellant.*

*Appeal from the United States District Court from the Western District in Washington in Case No. 2:10-cv-00828, Judge Ricardo S. Martinez*

## OPENING BRIEF OF DEFENDANT – APPELLANT

Philip P. Mann
Timothy J. Billick
MANN LAW GROUP
1218 Third Avenue, Suite 1809
Seattle, Washington 98101
(206) 436-0900

John Whitaker
WHITAKER LAW GROUP
1218 Third Avenue, Suite 1809
Seattle, Washington 98101
(206) 436-8500

*Attorneys for Defendant – Appellant
Tom Lalor*

May 6, 2015

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Tom Lalor, certifies the following:

1.     The full name of every party or *amicus* represented by me is:

Tom Lalor.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Tom Lalor.

3.     The parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the party or *amicus* represented by me are:

None.

4.     The name of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

| MANN LAW GROUP | WHITAKER LAW GROUP |
|---|---|
| Philip P. Mann | John Whitaker |
| Timothy J. Billick | |

Dated: May 6, 2015.          Respectfully submitted,

*/s/ Philip P. Mann*
Philip P. Mann

i

# TABLE OF CONTENTS

I.  STATEMENT OF RELATED CASES........................................................1

II. APPELLATE JURISDICTIONAL STATEMENT.....................................2

III. STATEMENT OF THE ISSUE...........................................................3

IV. STATEMENT OF THE CASE.............................................................4

V.  STATEMENT OF THE RELEVANT FACTS.........................................7

    A.  Mr. Lalor Is a Legitimate and Genuine Inventor..........................7

    B.  The Underlying Infringement Contentions..................................9

    C.  The Proceedings Below.............................................................11

VI. SUMMARY OF THE ARGUMENT.........................................................13

VII. ARGUMENT...................................................................................16

    A.  Standard of Review....................................................................16

    B.  The Jury's Finding on Validity Should Be Reinstated.................17

    C.  Claim 3 Is Not Anticipated by the Cited Prior Art......................19

        1.  The Jury Properly Discounted Mr. Westrick's Testimony
            Regarding the Bonge Reference................................................21

            (a)  Bonge discloses no dimensions...........................................22

            (b)  It is unclear whether Points D and E are part of the "collar
                  housing."..............................................................................23

            (c)  The distal ends of the electrodes could have been
                  substantially higher than the alleged high point surfaces
                  (Points D, E)........................................................................24

        2.  The Court Improperly Weighed Conflicting Evidence
            Concerning The Elite Receiver................................................27

3. The Jury Properly Ignored The Elite Receiver.........................28

    (a) The Elite Receiver Was Considered By The Examiner......29

    (b) Westrick Speculated Upon The Elite Receiver...................30

D. Claim 17 Is Not Anticipated by The Cited Prior Art..................35

    1. Mr. Westrick Speculated Regarding Bonge's Contact with the Animal's Skin................................................................................37

    2. The Elite Receiver Does Not Anticipate Claim 17..................39

        (a) The Elite Receiver Was Considered by The Examiner.......39

        (b) Mr. Gerig Admitted The Elite Receiver Housing Was Not Designed to Contact the Animal's Skin..............................40

    3. The Juliana Patent Does Not Anticipate Claim 17.................40

    4. The Duncan Patent Does Not Anticipate Claim 17.................44

VIII. CONCLUSION.........................................................................46

# TABLE OF AUTHORITIES

## TABLE OF CASES

*Burroughs Wellcome Co. v. Barr Lab. Inc.*, 40 F.3d 1223, 1227 (Fed.Cir. 1994)........................................................................................16

*Kern v. Levolor Lorentzen, Inc.* 899 F.2d 772, 775 (9th. Cir. 1990)..............16

*Richardson v. Perales,* 402 U.S. 389, 401 (1971)...........................................16

*Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1513 (Fed. Cir. 1984)..................................................................................17, 36

*Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed. Cir. 1998).........................17

*Orion IP, LLC v. Hyundai Motor Am.,* 605 F.3d 967, 975 (Fed. Cir. 2010)...17

*Dawn Equip. Co. v. Ky. Farms Inc.,* 140 F.3d 1009, 1014 (Fed. Cir. 1998)...17

*Microsoft Corp. v. i4i Ltd. L.P.*, 131 S. Ct. 2238, 2242 (2011).......................17

*Ormco Corp. v. Align Tech., Inc.,* 498 F.3d 1307, 1320 (Fed. Cir. 2007).......18

*Meyer Intellectual Properties Ltd. v. Bodum Inc.,* 690 F.3d 1354, 1374 (Fed. Cir. 2012)........................................................................19

*Wyers v. Master Lock Co.,* 616 F.3d 1231, 1242 (Fed. Cir. 2010)..................19

*Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984) 19

*Nystrom v. TREX Co., Inc.,* 424 F.3d 1136, 1149 (Fed. Cir. 2005)................20

*Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)..........................................................................20

*In re Wright,* 569 F.2d 1124, 1127 (C.C.P.A. 1977)........................................20

*Key Pharmaceuticals v. Hercon Labs. Corp.,* 161 F.3d 709, 714 (Fed. Cir. 1998).............................................................................21

*Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1050 (Fed. Cir. 1988) 29

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.,* 750 F.2d 1569, 1573 (Fed. Cir. 1984)..........................................................................29

*Plantronics, Inc. v. Aliph, Inc.,* 724 F.3d 1343, 1354 (Fed. Cir. 2013)...........36

# **TABLE OF STATUTES**

28 U.S.C. § 1338(a)..............................................................................2

28 U.S.C. § 1295(a)(1)....................................................................... 2

35 U.S.C. § 102....................................................................................17

# I.    STATEMENT OF RELATED CASES

This case was previously before this court as Appeal No. 2012-1233 captioned, *Radio Systems Corporation and Innotek, Inc., v. Tom Lalor and Bumper Boy, Inc.*  On March 6, 2013 a panel composed of Judges Newman, Moore and Reyna agreed with Mr. Lalor that equitable estoppel did not bar his action for infringement of his United States Patent No. 7,267,082 and remanded the action for trial.  That prior decision is reported at 709 F.3d. 1124 (Fed. Cir. 2013).

Counsel is unaware of any other appeal in or from the same civil action or proceeding as this matter that was previously before this or any other appellate court.

There are no other cases known to counsel pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## II.   APPELLATE JURISDICTIONAL STATEMENT

(a)   Jurisdiction in the District Court was based upon 28 U.S.C. § 1338(a) because this is a civil action arising under an Act of Congress relating to patents.

(b)   This Court's jurisdiction is based on 28 U.S.C. § 1295(a)(1), this being an appeal from a final decision of a District Court in a civil action arising under an Act of Congress relating to patents.

(c)   This appeal is timely under Fed. R. App. P. 4. Final judgment was entered by the District Court on January 9, 2015. A Notice of Appeal to this Court was timely filed on January 30, 2015.

### III.   STATEMENT OF THE ISSUE

1.     Did the District Court err in overturning the Jury's verdict finding Claims 3 and 17 of Mr. Lalor's  United States Patent No. 7,267,082 infringed and not invalid.

## IV.   STATEMENT OF THE CASE

This Declaratory Judgment action, brought by Radio Systems, Inc. and Innotek, Inc., (collectively, "Radio Systems") against Mr. Lalor, returns to this Court following an eight day jury trial in which the Jury returned a verdict in favor of Appellant, Mr. Lalor.  In particular, the Jury found that various electronic dog training collar products manufactured and sold by Radio Systems infringe Claims 3 and 17 of Mr. Lalor's U.S. Patent No. 7,267,082 ("the '082 Patent").  The Jury also found that each of these claims was "not invalid," and awarded Mr. Lalor damages in the amount of  $612,500. A1681-A1684.

Following the Jury's verdict in Mr. Lalor's favor, the District Court set it aside holding that Claims 3 and 17 of the '082 Patent were invalid as a matter of law.  A2-A23. In this appeal, Mr. Lalor challenges this holding by the District Court and seeks reinstatement of the Jury's verdict as well as reentry of the judgment in his favor.

Mr. Lalor's '082 Patent is directed to various improvements in electronic dog training collars.  In particular, the '082 Patent is directed

4

toward a collar that enhances comfort and helps avoid sores and other skin maladies often caused by prior art collars.

Radio Systems is a well-known manufacturer of  dog training collars that incorporate the improvements claimed in Mr. Lalor's '082 Patent.   Indeed, at trial, Radio Systems' own expert, Mr. Michael Westrick, was forced to concede that each of the asserted claims of the '082 Patent, did, in fact, "read on" each of the accused devices. A3549-A3553.

At trial, Radio Systems' expert, Mr. Westrick, opined that all of the asserted claims of the '082 Patent were invalid based on various pieces of prior art.  Although the Jury agreed that some of the asserted claims were invalid, the Jury nevertheless found that two asserted claims, namely Claims 3 and 17 of the '082 Patent were *not* invalid and were infringed. This finding by the Jury is not surprising given that Claim 3 and 17 each contain material limitations that are simply *not* disclosed in any of the prior art introduced at trial. Mr. Westrick could only speculate as to invalidity by way of super-imposed measurement, assumption, and other forms of guesswork.

The Jury correctly concluded that Mr. Westrick's guesswork does not rise to the level of "clear and convincing" evidence needed to invalid patent claims. However, the District Court, apparently stepping into the shoes of the jurors, vacated the verdict and found the '082 Patent to be invalid as a matter of law. A22-23. Principally, the District Court held that United States Patent No. 5,872,516 "Ultrasonic Transceiver and Remote Controlled Device for Pets" by Nicholas  J. Bonge Jr. (the "Bonge reference") and Radio Systems' "Elite Receiver" collar both independently anticipate Claims 3 and 17 of the '082 Patent. A6-8. The District Court mentioned other references regarding Claim 17, but only provided analysis concerning Bonge. A11-A12.

Again, Mr. Lalor brings this appeal in order to vacate this post-trial action of the District Court and to to reinstate the Jury's verdict of infringement.

## V.    STATEMENT OF THE RELEVANT FACTS

This case originated as a declaratory judgment action brought by Radio Systems in an attempt to avoid liability for infringement of Mr. Lalor's United States Patent No. 7,267,082 ("the '082 Patent"), entitled "Animal Collar" issued on September 7, 2007.

### A.    Mr. Lalor Is a Legitimate and Genuine Inventor

Mr. Lalor is a Canadian citizen living and working in Vancouver, British Columbia. A3616. For the past thirty years Mr. Lalor has supported himself as a successful inventor and businessman engaged in a variety of business ventures, including a company called "Canon Computer" (A3619), then later starting "Bumper Boy" (A3622). Indeed Mr. Lalor is a named inventor on eight other patents as well (A3623-A3624). Mr. Lalor is also an avid sportsman and dog trainer and has considerable expertise and experience in training dogs for hunting and other purposes. A3616-A3622. At trial, Mr. Lalor shared with the Jury his first hand experience with using radio-operated training collars that function to give a correction stimulus to a dog during training. A3616-A3622. Such collars can be used during training a dog for hunting or,

7

more commonly, for training a dog to stay within a particular area, such as a back or front yard, when outdoors. Such collars find use, for example, in the popular "Invisible Fence®" systems offered by Radio Systems.

After using and observing the various electronic training collars available in the early 2000s, Mr. Lalor recognized there was room for improvement.  In particular, Mr. Lalor noticed that dogs often develop sore spots in the skin of their necks where the electrodes of the collar make contact.  Such sore spots developed due to an undue amount of pressure and friction between the points of the electrodes and the dog's skin. A3626-A3629. Affixing the collar too tightly around the dog's neck resulted in a higher propensity and severity of sores, leading to additional health and behavioral problems of the animal. A3626-A3629. On the other hand, affixing the collar too loosely resulted in improper electrode contact, nullifying the purpose of the training collar. A3627-A3628.

Mr. Lalor recognized that greater dog comfort and collar effectiveness could be combined by shaping the collar so as to ensure

8

positive contact between the collar electrodes and the dog's skin, while limiting the extent to which the electrodes could press into the dog's neck. A3628-A3632. In particular, Mr. Lalor realized that by appropriately shaping the housing portion of the collar that supports the electrodes and contains the associated electronics, he could create a collar that fits tight enough around the animal's neck to ensure good electrical contact, while avoiding the pressure, rubbing and abrasion that leads to sore spots and animal discomfort. A3628-A3629.

After experimenting with various designs, Mr. Lalor identified the attributes needed to make an effective, improved collar. A3628-A3631. One such attribute was ensuring that the electrode tips of the collar are less than 3/8 of an inch closer to the animal during use than certain high point surfaces on the collar. A56. Limiting the relative electrode length in this manner prevents the electrodes from causing sores and discomfort in the animal.

## B.    The Underlying Infringement Contentions

After developing his invention, Mr. Lalor applied for a series of patents. His first United States application was filed on August 5, 2003

and ultimately issued as U.S. Patent No. 6,830,014 (the "014 Patent") on December 14, 2004. A15.  Mr. Lalor also filed a series of continuation-in-part applications that claimed priority to the August 5, 2003 filing date of his original applications. One of these continuing applications ultimately issued on September 11, 2007 as the '082 Patent. A16. Each of the asserted claims of the '082 Patent is fully supported by the original disclosure of the parent application, and each of the asserted claims of the '082 Patent is entitled to the priority date of the original application.

In early 2005, Mr. Lalor learned and determined that Innotek, Inc. was selling electronic animal collars that included his patented technology. A15. On February 21, 2005, Mr. Lalor, through his Canadian attorneys, wrote to Innotek to inform them of his then issued '014 Patent and to advise them of their apparent infringement. A15. On April 29, 2005, Innotek, through its counsel, responded claiming, in part, that certain alleged prior art rendered the '014 Patent invalid. A15.

After receiving the purported prior art supplied by Innotek, and during the pendency of a continuing application then in existence, Mr. Lalor filed a continuation-in-part application that included additional claims directed to his invention. A16-A17. These claims, which, further distinguished the alleged prior art, ultimately issued as the '082 Patent on September 11, 2007. A16-A18. In particular, the '082 Patent application was written in order to distinguish Mr. Lalor's invention from the purported prior art from Radio Systems. A16.

## C.    The Proceedings Below

After this Court reinstated Mr. Lalor's action under the '082 Patent and remanded the case for trial, the District Court denied Mr. Lalor's motion to realign the parties (A34, Dkt. 163; A35, Dkt. 164) and allowed Radio Systems to proceed first, and finish last, at trial.   In addition, the District Court granted Radio Systems' motion to preclude Mr. Lalor's technical expert from testifying as to infringement at trial. A34, Dkt. 163; A35, Dkt. 164.

Trial began on October 14, 2014 before an eight-person Jury. A35. Radio Systems called one of its former employees, Mr. Michael

Westrick, as an expert in electronic dog collars to testify that, in his opinion, all asserted claims of the '082 Patent are invalid in view of several pieces of prior art, including the Bonge patent and the Elite Receiver product.  Significantly, Mr. Westrick was unable to show that any of the references upon which he relied disclose each material limitation of Claims 3 and 17 of the '082 Patent.  In particular, Claim 3 specifies a dimensional range that is not shown, while Claim 17 specifies an "inside surface that is designed for contacting the skin of the animal during use" that is also not shown. Mr. Westrick purported to overcome these deficiencies offering his guesses or speculations as to how things might be.

## VI.  SUMMARY OF THE ARGUMENT

The District Court erred in vacating the Jury's verdict of infringement and validity of Claims 3 and 17 of the '082 Patent, and in holding that Claims 3 and 17 of the '082 Patent are anticipated as a matter of law.

Radio Systems failed to prove to the Jury with clear and convincing evidence that Claims 3 and 17 are invalid. Indeed, Radio Systems (over Mr. Lalor's objection) enjoyed the privilege of getting to present its case first and address the Jury last. A34, Dkt 158. Radio Systems' principal witness on invalidity, Mr. Michael Westrick, was cross-examined regarding his opinion on all of the cited prior art. Most pointedly, Mr. Westrick's inconsistencies concerning Bonge and Elite Receiver references were demonstrated to the Jury. The Jury correctly ascertained that Mr. Westrick's direct testimony was based on pure speculation.

The District Court inappropriately weighed evidence in setting aside the verdict and failed to appreciate that the testimony elicited during cross-examination was *already* weighed by the Jury when it

found Claims 3 and 17 valid and infringed. At the close of all the evidence and before the Jury was instructed, the Court itself noted sufficient evidence from both Parties as it denied Radio Systems' Rule 50 motion. A2966-A2967. Indeed, the Court stated that it "heard certain testimony that would make me lean one way or the other, but I think in terms of being able to rule as a matter of law and take it away from the jury, I'm not satisfied I'm at that point right now ..." A2966-A2967.

The Jury's verdict was ultimately delivered after *several days* of deliberation – the Jury did not take its task lightly. However, the District Court improperly found that the Bonge reference anticipated Claims 3 and 17 by relying upon Radio Systems' rampant speculations concerning the same. The District Court also held that the Elite Receiver was both considered by the examiner, yet invalidated the '082 Patent. Finally, in its Opinion, the District Court mentioned the Bonge, Elite Receiver, Juliana, and Duncan references to rule that Claim 17 is anticipated, yet only analyzed Claim 17 as anticipated by Bonge. A10-A12.

The Jury correctly concluded that no "clear and convincing evidence" was presented to invalidate Claims 3 and 17. By setting aside this correct verdict of the Jury, the District Court usurped the Jury's role of fact-finder on what the District Court itself conceded was a close question. In so doing, the District Court improperly shifted the burden to Mr. Lalor to prove the validity of his own claims. This action was wrong and it should be vacated.

# VII.  ARGUMENT

## A.    Standard of Review

This Court reviews a district court's grant of JMOL under Fed. R. Civ. P. 50 *de novo*. *Burroughs Wellcome Co. v. Barr Lab. Inc.*, 40 F.3d 1223, 1227 (Fed.Cir. 1994). On appeal, this Court applies the same standard as did the district court – examining the record in the light most favorable to the non-movant and drawing inferences in its favor to determine if substantial evidence supports the jury verdict. *Id.* Accordingly, where there is sufficient conflicting evidence, or where reasonable minds could differ over the verdict, judgment as a matter of law after the verdict is improper. *Kern v. Levolor Lorentzen, Inc.* 899 F.2d 772, 775 (9th. Cir. 1990).

Because of the respect due the constitutional right to a jury trial, judicial interposition on a finding of invalidity is limited to only two circumstances: the jury's findings are not supported by substantial evidence[1]; or, if they are, that the legal conclusions cannot be supported

---

[1] Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

by such findings. *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1513 (Fed. Cir. 1984). *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed. Cir. 1998). The same is true whether the jury makes specific findings of fact, or if the specific findings are implied from a return of a general verdict. *Railroad Dynamics*, 727 F.2d at 1513.

## B.    The Jury's Finding on Validity Should Be Reinstated

A patent claim is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference expressly or inherently discloses every limitation of the claim. *Orion IP, LLC v. Hyundai Motor Am.,* 605 F.3d 967, 975 (Fed. Cir. 2010). Whether a reference discloses a limitation is a question of fact, and a jury's findings on questions of fact are reviewed for substantial evidence. *Dawn Equip. Co. v. Ky. Farms Inc.,* 140 F.3d 1009, 1014 (Fed. Cir. 1998). Because patents are presumed valid, invalidity by anticipation must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.* L.P., 131 S. Ct. 2238, 2242 (2011).

Claims 1, 15, and 17 of the '082 Patent are independent claims, and the remainder are dependent claims. Mr. Lalor now seeks to

reinstate the jury's finding of validity of Claim 3, which depends on

Claim 1; as well as Claim 17.

Claim 1 reads as follows:

1. An animal collar designed for attachment to an animal, comprising:
a collar housing having an inside surface directed toward the animal during use;
a first electrode directed toward the animal during use, said first electrode intersecting said inside surface at a first electrode base; and
a second electrode directed toward the animal during use, said second electrode intersecting said inside surface at a second electrode base;
said inside surface having at least one high point surface extending above at least one of said first electrode base and said second electrode base and toward the animal during use;
said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.
A55, '082 Patent, Claim 1

It is well-settled law, of course, that as long as a dependent claim,

as a whole, introduces independently patentable subject matter, it can

remain valid even when its independent claim is invalid. *Ormco Corp.*

*v. Align Tech., Inc.,* 498 F.3d 1307, 1320 (Fed. Cir. 2007).

Throughout its Opinion, the District Court repeatedly mimics Mr. Westrick's testimony and states that Mr. Lalor provided no rebutting expert of his own. A7 ("Defendant did not present any experts of his own"); A11 (same). However, it is well-settled that such expert testimony is unnecessary, especially in cases such as here where the invention is extremely easy to understand: high point surfaces on dog collars. See, e.g., *Meyer Intellectual Properties Ltd. v. Bodum Inc.,* 690 F.3d 1354, 1374 (Fed. Cir. 2012); *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1242 (Fed. Cir. 2010); *Union Carbide Corp. v. Am. Can Co.,* 724 F.2d 1567, 1573 (Fed. Cir. 1984). The District Court unduly shifted the burden of persuasion concerning invalidity squarely on Mr. Lalor and its ruling must be accordingly vacated.

## C.    Claim 3 Is Not Anticipated by the Cited Prior Art

Rather than reviewing conflicting evidence in favor of the non-movant Mr. Lalor, the District Court went out of its way to ignore the Jury's findings and invalidate Claim 3. It adopted the opinion of Radio Systems' expert and ignored the well-known tenet that "patent drawings do not define the precise proportions of the elements and may

19

not be relied on to show particular sizes if the specification is completely silent on the issue." *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005) (citing *Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000)). Thus, "[a]bsent any written description in the specification of quantitative values, arguments based on measurement of a drawing are of little value." *Avia*, 222 F.3d at 956 (quoting *In re Wright*, 569 F.2d 1124, 1127 (C.C.P.A. 1977)). It's error should be reversed accordingly.

Claim 3 reads as follows, with the seminal portion being underlined:

> 3. The animal collar according to claim 1, wherein said first electrode has a first electrode distal end opposite said first electrode base and extending toward the animal during use, and wherein said second electrode has a second electrode distal end opposite said second electrode base and extending toward the animal during use, and <u>wherein said first electrode distal end and said second electrode distal end are no more than 3/8 inch (0.95 cm) closer to the animal during use than said at least one high point surface.</u>

A56, 12:28-36 (emphasis added).

As will be shown below, substantial evidence supports the Jury's verdict that Claim 3 was not rendered invalid by either the Bonge reference or the Elite Receiver.

### 1. The Jury Properly Discounted Mr. Westrick's Testimony Regarding the Bonge Reference

The District Court improperly disregarded the cross examination of Radio Systems' witnesses, as well as the Jury's consideration of the same. Whether a patent claim is anticipated is susceptible to a Rule 50 JMOL only where no facts material to the question are disputed. *Key Pharmaceuticals v. Hercon Labs. Corp.*, 161 F.3d 709, 714 (Fed. Cir. 1998) (applying the standard at summary judgment stage).

Given that Mr. Westrick worked for Innotek for a period of approximately ten years, and indeed helped form Innotek, it is also possible the Jury found the following speculations to be highly suspect. A1785-A1793. Indeed, Mr. Westrick held numerous positions with Innotek until it was eventually merged with Radio Systems around 2006. A1785-A1793; A2797, Mainini Direct Examination. Here, the material facts relating to anticipation were most definitely disputed. It

was entirely within the province of the Jury to assess the relative weight of Mr. Westrick's, direct examination, cross examination, and his potential biases towards a company he helped create.

### (a)    Bonge discloses no dimensions.

Claim 3 explicitly recites that the distal ends of the electrodes are "no more than 3/8 inch (0.95 cm) closer to the animal during use than said at least one high point surface." A56. It is undisputed that Bonge does not disclose any dimensions whatsoever, and certainly does not disclose that any distal ends of electrodes are less than 3/8 inch closer to the animal during use.

Mr. Westrick's opinion regarding Bonge was based *solely* on what is disclosed in that patent and in the annotated cross-sectional illustration (copied below for convenience). A3556; A2472-A2489 (entire Bonge reference); A2491-A2497 (annotated Bonge reference). Importantly, an actual Bonge product was actually shown at trial. A3554-A3555. This could have resolved  Mr. Westrick's speculations about whether Points D and E are indeed a part of the housing. Accordingly, nothing was shown to the Jury from which the actual

dimensions of the Bonge reference could be ascertained. Instead the Jury was forced to choose whether or not to  believe Mr. Westrick's speculations. This troubling absence of dimensions and clarity laid the foundation of Mr. Westrick's translucent opinion regarding Bonge. Given the Jury's verdict, they obviously did not.

### (b)   It is unclear whether Points D and E are part of the "collar housing."

The District Court instructed the jury to define "collar housing" as a "fully enclosed case supporting the electrode(s) and covering components of the animal collar." A1645.  When speculating on Points D and E of Bonge, Mr. Westrick referred to them as "enclosed openings," but he could not support his opinion that these points supported the electrodes or covered components of the collar. A3556-A3557. Specifically, Mr. Westrick testified that Points D and E do not support electrodes, and they are not fully enclosed. A3557. Thus, it is

unclear whether the high-point surfaces D and E are a part of the "collar housing" as construed by the District Court. This testimonial evidence could have reasonably convinced the Jury to find that Bonge did not invalidate Claim 3 by clear and convincing evidence.



### (c) The distal ends of the electrodes could have been substantially higher than the alleged high point surfaces (Points D, E).

Even if the Jury did accept Westrick's speculation that Points D and E are a part of the "collar housing," absolutely *nothing* in the drawing or description of Bonge indicates that the ends of the electrodes are less than 3/8" closer to an animal than those alleged high-point surfaces, because again, Bonge discloses no dimensions.

Mr. Westrick initially vacillated as to whether Points 58 and 59 were electrodes with distal ends, or whether those points were threaded posts to accept electrode probes. A3560-A3561. However, upon actually *reading* the description of the Figure within the Bonge Patent, Mr.

Westrick admitted that Points 58, 59 were designed to accept threaded electrode probes. A3562-A3563.[2]

Mr. Westrick accordingly had no choice but to admit that if electrodes were screwed to Points 58, 59, then the distal ends of the electrode probes would likely extend "substantially higher" than the so-called high point surfaces located at Points D and E. A3563. If electrode probes are screwed onto the threaded electrode posts 58, 59, then it is likely that the distal ends of the electrodes would protrude *far beyond* the purported high point surfaces D and E, as illustrated below[3]:



_____

2 This damage done to Mr. Westrick's credibility was also likely considered by the Jury.

3 Appellant has overlaid the images of electrode probes on to the Bonge reference for illustrative purposes only. This depiction was not shown to the Jury.

Throughout the rest of the trial, the Jury heard ample evidence that that electrode probes come in a wide range of lengths. A2806-2807, Mainini Direct Examination ("Sometimes we call them probes." … "[t]hey can range from a quarter of an inch to an inch and a half."). The Jury also saw the varying lengths of electrode probes for themselves. See, e.g., Trial Exhibit 028 Electrodes for Elite Receiver, A2451-A2452 as depicted below:



See also, A3559: ("A: I just removed the electrode – excuse me – the probe from the collar unit."). Accordingly, because electrodes screw onto the threaded posts described on Bonge, then the distal ends of such electrodes would extend far beyond the purported high point surfaces D and E. It is therefore neither clear nor convincing that those high points are less than 3/8" closer to the animal than said surfaces. As a result,

the Jury could have reasonably found that the Bonge reference did not anticipate Claim 3 of the '082 Patent.

The District Court decided instead to ignore the Jury's finding and substitute its own. The Bonge reference discloses *zero* dimensions or measurements, and Radio Systems failed to discover and determine those actual dimensions. The Jury rightly discounted these speculations and suppositions of Mr. Westrick, but the District Court however improperly substituted its *own* findings of fact for those of the Jury.

## 2. The Court Improperly Weighed Conflicting Evidence Concerning The Elite Receiver

The District Court's findings on anticipation and inequitable conduct regarding the Elite Receiver are at odds with each other. Chiefly, the District Court provided zero analysis as to why the Elite Receiver met each and every limitation in Claim 3. Instead of citing the testimony concerning the Elite Receiver, the District Court cited Defendant's cross-examination concerning the Christiansen patent, and later the Peterson patent. A8-A11. Then, the District Court concluded

that Mr. Lalor's disclosure of the Elite Receiver in his third Information

Disclosure Statement ("IDS") was in fact reviewed by the examiner.

A19 ("the Court concludes, in favor of the non-moving party, that the

information disclosed in the third IDS was reviewed by the examiner.").

This should come to no surprise, for Radio Systems' own expert

conceded that the examiner did indeed consider the Elite Receiver and

still allowed the '082 Patent to issue. A3788-A3789; A3798-A3801.

Accordingly, the District Court concluded that Christiansen,

Peterson, and the Elite Receiver were all considered by the examiner,

but still ruled that the Elite Receiver anticipated Claim 3. This analysis

fails to weigh conflicting evidence in favor of the non-movant Mr. Lalor,

and it does not establish by clear and convincing evidence that the Elite

Receiver anticipates each and every limitation in Claim 3.

### 3.    The Jury Properly Ignored The Elite Receiver

When a party attacking the validity of a patent relies on prior art

which was specifically considered by the examiner during the

prosecution of the application leading to the issuance of the patent, that

party bears the burden of overcoming the deference due a qualified

government agency official presumed to have performed his or her job. See, e.g., *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050 (Fed. Cir. 1988); *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1573 (Fed. Cir. 1984). The Jury could have reasonably trusted a trained patent examiner.

Here, the District Court recognized that the patent examiner considered the Elite Receiver before allowing the '082 Patent to issue. A19. The Jury heard the same evidence and found accordingly. A1682. Yet somehow, the District Court managed to conclude that the Elite Receiver disclosed each and every limitation within Claim 3. The Jury also heard how similar the Elite Receiver is to other art cited on the face of the '082 Patent. Westrick Cross, A3589-A3591 (concessions to its relationship to the Christiansen reference); A3593-A3594 (concessions relating to Peterson).

### (a)    The Elite Receiver Was Considered By The Examiner

The Elite Receiver was considered by the examiner who nevertheless allowed the '082 Patent to issue. A3798-A3801. Radio

Systems' own expert on inequitable conduct Mr. Peter Chu admitted this fact on cross-examination. A3788-A3789. Accordingly, the Jury could have believed this evidence over the testimony of Mr. Westrick. Likewise, the Jury could have deemed this fact probative, even dispositive, in determining that Claim 3 of the '082 Patent is not anticipated by the Elite Receiver.

### (b)   Westrick Speculated Upon The Elite Receiver

At trial, it was established that the examiner considered the Elite Receiver. Additionally, during cross-examination, Mr. Westrick made numerous concessions and dubious assertions regarding the Elite Receiver. Trial Exhibits 39 (A2462-A2468) and 40 (A2470), used to depict the seminal aspects of the Elite Receiver, are reproduced below for convenience:



### (i) The relationship between the alleged microscopic high point surface and unknown electrode tips is unclear.

The alleged high point surfaces located outside of the electrode bases of the Elite Receiver, indicated above as Points D and E, come nowhere close to the skin of a dog's neck during use. A3579-A3584. Further, Mr. Westrick admitted that the Elite Receiver could accept electrodes of different sizes. A3584 ("Q: Is that the type that screws onto a thread and stud? A: It is."). The Jury made a factual determination that the distal ends of these electrodes are *not* less than 3/8" closer to the animal than the purported high point surfaces of the Elite Receiver. However, the District Court, placing itself as a fact-finder, set this finding aside and declared that the Jury's determination was wrong.

### (ii) The rubber insulators confuse the precise location of the electrode base.

The electrodes on the Elite Receiver incorporate rubber insulators which form part of both respective electrode bases. A3585: (A: "I'm sorry. Yes, the electrode base they are a part of, yes."); *Compare,* A2470 to A2462 (copied above). However, curiously, Radio Systems placed its

notional line at the ***bottom*** of this rubber insulator as shown in A2462, even though Mr. Westrick told the jury – twice – that these insulators form part of the electrode base. Because the Jury was instructed to define "electrode base" as "the portion of the electrode where it intersects the inside surface of the collar housing," (A1645), the Jury could reasonably have placed this notional line anywhere upon these rubber insulators.



Notional line should have been placed here to be in accord with the definition of "electrode base," and eliminate Points D and E as alleged "high point surfaces" outside of the central area.

Fig. 1

**LEGEND**

<12> Collar Housing
<18> Inside Surface
<24> Electrode
<26> Electrode Base
<28> Electrode Distal End
<30> Central Longitudinal Axis

<32> Notional 90-degree Plane Extending from Point X
<33> Notional 90-degree Plane Extending from Distal End of Electrode
<C> High Point Surface
<D> High Point Surface Extending Above Nominal Plane <33>
Point on Central Longitudinal Axis

A2462

For instance, as depicted by Appellant above with a solid red line, if the notional line was instead placed at the top of the rubber insulator in A2462, then the above microscopic high point surfaces at Points D and E would not exist. This is yet another piece of evidence in Mr. Lalor's favor the Jury likely weighed when it held Claim 3 to be valid and infringed.

### (iii) The Elite Receiver is analogous to Christiansen, which was considered by the examiner.

On cross-examination, Mr. Westrick admitted that Christiansen and the Elite Receiver are analogous. A3588-A3591. Portions of Trial Exhibit 039, Elite Receiver (A2462-A2468) and Trial Exhibit 050, Christiansen (A2534-A2540) are copied herein for convenience:



Mr. Westrick opined that Points C, D, and E of the Elite Receiver meet the same definition of high point surfaces as Points C, D, and E of the Christiansen reference. A3591: ("Yeah, they both meet the definition, certainly."). The Jury also heard Mr. Westrick say that the similar Christiansen patent was considered by the examiner. A3591. Accordingly, the Jury very well could have trusted the judgment of a patent examiner over Mr. Westrick when it held that the Elite Receiver did not invalidate Claim 3 of the '082 Patent.

### (iv) The Elite Receiver is analogous to Peterson, which was also considered by the Examiner.

Mr. Westrick made the exact same concessions as to the Peterson reference, comparing the Elite Receiver (A2462) and Peterson (A2696-A27097) (copied below). A3592-A3594.

 

Mr. Westrick told the Jury that Points C, D, and E are found on Peterson using the same approach as he did with the Elite Receiver. A3594. The Jury, likewise, could have found that the '082 Patent was not anticipated because the high points C, D, and E of the Elite Receiver were nearly identical to the points C, D, and E of a reference that was also considered by the examiner.

In sum, the Jury heard substantial evidence that the Elite Receiver was considered by the examiner, Mr. Westrick's testimony was highly suspect, and the Elite Receiver was comparable to other references considered by the examiner. The Jury weighed this evidence, made factual determinations concerning the Elite Receiver, and found in favor of Mr. Lalor. Thus, the District Court's holding that the Elite Receiver anticipates Claim 3 should be vacated.

**D.    Claim 17 Is Not Anticipated by The Cited Prior Art**

As an initial matter, the District Court ruled that Claim 17 is anticipated by Bonge, the Elite Receiver, United States Patent No D330,173 ("Juliana") and its commercial embodiment, and United States Patent No 6,052,097 ("Duncan"). However, the District Court

only analyzed and discussed the Bonge reference. A10-12. Its holding

that Claim 17 is anticipated by the Elite Receiver, Juliana and its

commercial embodiment, and Duncan is therefore deficient on its face

and should be vacated accordingly.   See, *Plantronics, Inc. v. Aliph, Inc.*,

724 F.3d 1343, 1354 (Fed. Cir. 2013).

The District Court again ignored the implications from the Jury's

finding of validity, stating its conclusion was "not reasonable in light of

the evidence in the record with respect to prior art." A11. However, the

Jury weighed numerous factual disputes in its determination of

validity, and its verdict must accordingly be reinstated. See, *Railroad

Dynamics*, 727 F.2d at 1513.

Claim 17 of the '082 Patent provides:

**17.** An animal collar designed for attachment to an
animal, the collar having a stimulating unit for generating a
stimulus and first and second electrodes directed toward the
animal during use for transferring the stimulus to the animal,
the collar comprising:
a collar housing for containing the stimulating unit and for
supporting the electrodes, said collar housing having an
inside surface <u>designed for contacting the skin of the
animal during use</u>, the first electrode intersecting said
inside surface at a first electrode base, and the second
electrode intersecting said inside surface at a second

electrode base;

said inside surface having at least one high point surface
   extending above at least one of said first electrode base
   and said second electrode base and toward the animal
   during use;

said at least one high point surface located outside of a
   central area of said housing, said central area located
   between said first electrode base and said second elec-
   trode base.

(A2413, '082 Patent, Claim 17, emphasis added).

### 1.    Mr. Westrick Speculated Regarding Bonge's Contact with the Animal's Skin

Mr. Westrick's testimony regarding contact with the animal's skin

was based on pure speculation. As noted above, the Bonge reference

discloses threaded posts to accept electrode probes. See, *supra,* Section

VII.C.1.(c). Mr. Westrick testified that when the threaded posts in

Bonge accept electrodes, the distal ends of the electrodes would extend

"substantially higher" than Bonge's alleged high-point surfaces:

> Q: Doesn't that indicate those electrodes are threaded?
> A: Yes, they are threaded.
> […]
> Q: And wouldn't be possible to screw the electrode onto
> that?
> A: It would be possible, yes.
> Q: And if that happened, these electrodes would stick
> up substantially higher than this line that we see
> here?

A: They would.
A3562-A3563.

As depicted here by Appellant (right), the Jury reasonably could have found that when actually implemented into a product, these electrodes would  prevent the collar from "contacting the skin of the animal during use" due to the electrodes preventing such contact.

Further demonstrating that the Bonge reference was not "designed for contacting the skin of the animal during use" is Mr. Westrick's testimony concerning the strap disclosed in Bonge. A3357-A3358; see also, Reference 29 above. In particular, Mr. Westrick admitted that the strap disclosed in Bonge would prevent the collar housing from contacting the animal's skin during use. A3357-A3358. At the very least, this testimony created factual issues which were resolved in the Jury's finding that Claim 17 was valid and infringed.

## 2.    The Elite Receiver Does Not Anticipate Claim 17

The District Court failed to provide an analysis concerning whether or not the Elite Receiver anticipates Claim 17. A10-12. However, without waiver of the argument that the District Court's failure to do so constitutes reversible error, Mr. Lalor responds substantively below.

### (a)    The Elite Receiver Was Considered by The Examiner

Mr. Lalor incorporates his above arguments, *supra,* Section VII.3. (a) showing that the examiner considered the Elite Receiver. The Jury easily could have discounted the Elite Receiver because it was considered by the examiner of the '082 Patent. Given that the Jury **unanimously** found no inequitable conduct (A1682), it is clear that the Jury found that the examiner indeed considered the Elite Receiver. Even if the Jury found that the Elite Receiver was *not* considered by the examiner, it could have found that the Christiansen and Peterson references were so closely analogous to the Elite Receiver[4] so as render

_____

4 As discussed, *supra*, Mr. Westrick on cross-examination conceded that the high point surfaces of the Elite Receiver were analogous to both the Christiansen and Peterson references.

it moot. Further, as discussed above, the Elite Receiver's outside high point surfaces do not come close to contacting the animal's skin during use, and they were most certainly not designed for doing so, as is required by Claim 17.

### (b)   Mr. Gerig Admitted The Elite Receiver Housing Was Not Designed to Contact the Animal's Skin

On cross-examination, Mr. Duane Gerig admitted that the Elite Receiver collar housing was not "designed for contacting the skin of the animal during use" as required by Claim 17. Rather, it was intended to test a different method of enclosing the electronics, and to prevent the housing from hitting debris. A3600-A3601. Because Mr. Gerig admitted this limitation was not met by the Elite Receiver, and because the electrodes on the Elite Receiver could very well extend long enough to prevent such contact, the Jury very reasonably found that Claim 17 is not anticipated by the Elite Receiver.

### 3.   The Juliana Patent Does Not Anticipate Claim 17

The District Court failed to provide an analysis concerning whether the United States Patent No D330,173 ("Juliana") and its commercial embodiment anticipated Claim 17. However, without

40

waiver of the argument that this constitutes reversible error, Mr. Lalor responds substantively below.

The U.S. Patent No. Des. 330,173 awarded to Juliana, et al (A2499-A2502, Trial Exhibit 044); (A2504-A2510, Trial Exhibit 045) and its attendant commercial embodiment (A2447-A2448, Trial Exhibit 021) discloses nothing beyond Figure 3 within the patent (copied below).



Juliana accordingly does not disclose whether or not *any* inside portion surface of the collar housing is "designed for contacting the skin of the animal during use." Additionally, neither the Juliana patent nor the Juliana product show a high point surface extending above an electrode base. Further still, neither the Juliana patent nor the Juliana product show a high point surface located "outside of the central area,"

as is required by Claim 17. All of these facts were made known to the Jury. On cross-examination, Mr. Westrick only speculated as to whether the purported outside high point surfaces (Points D, E above) would contact the animal's skin during use. A3567. Mr. Westrick went on to agree that the Juliana Patent does not "include how it works and how it was built." A3567.



Upon comparing Juliana (left) with Fig. 4 of the '082 Patent (right), Mr. Westrick speculated that the Juliana reference may or may not achieve the goal of the '082 Patent, but he went on to admit that "the Mr. Lalor's collar (Figure 4) would probably be more comfortable than the Juliana enclosure." A3566. Thus, Mr. Westrick agreed that Mr. Lalor's collar incorporated outside high point surfaces that are

designed to support the skin of the animal, but the Juliana reference and product do not. The Jury properly weighed this conflict in testimony, for it is neither clear nor convincing that the Juliana references above anticipate each and every element of Claim 17.

The District Court also ignored the direct testimony of Mr. Lalor when he distinguished his invention from the Juliana Product. On direct examination, Mr. Lalor showed the Jury what was essentially explained above, and what was conceded by Mr. Westrick: the outside high point surfaces of his invention alleviate pressure from the electrodes. See, A3631-A3633. After Mr. Westrick admitted that the the '082 Patent claims read on the accused UltraSmart and Venture Series collars (A3552), Mr. Lalor explained to the Jury how Juliana is distinct from the UltraSmart collar. A3631-A3633. Mr. Lalor described to the Jury how examining and pressing the collars would determine whether the high point surfaces on various collars alleviated pressure. A3632. Given Mr. Westrick's admissions, and Mr. Lalor's distinctions, the Jury rightfully concluded that Juliana does not invalidate Claim 17.

### 4.    The Duncan Patent Does Not Anticipate Claim 17

The District Court failed to provide an analysis concerning whether or not the United States Patent No 6,052,097 ("Duncan") anticipated Claim 17. A10-12. However, without waiver of the argument that this constitutes reversible error, Mr. Lalor responds substantively below.

The Duncan reference was submitted to the Jury in its entirety as Trial Exhibit 047 (A2514-A2524), with annotated drawings of the same submitted as Trial Exhibit 048 (A2526-A2532). The jury could have reasonably concluded that Figure 1, which is cited as prior art in the '082 Patent, is remarkably similar to the Duncan reference. *Compare* Duncan, Trial Exhibit 048 (on the left) with Figure 1 of the '082 Patent (on the right) (copied below):

See also, A2532 (Duncan); and A43 (Figure 1 of the '082 Patent). Mr Westrick admitted that both of these depictions could have skin contacting similar points, for Figure 1 depicts outside high point surfaces similar to those depicted in Duncan. A3576-A3577. Further,

44



Radio Systems' argument that only the cross-hatched section, Point 34 above, constitutes "central area" as construed by this Court does not comport with a common-sense reading of such an construction, and the Jury was free to reject this argument.

Given that the examiner Claim 17 over Figure 1, it is reasonable that a cumulative reference to Figure 1 should be accordingly ignored. This should not be surprising, for nowhere does the Duncan patent state that the purported high point surfaces at Points D, E were designed for making contact with the animal's skin during use. Therefore, it is neither clear nor convincing that Duncan reads on every

limitation within Claim 17, and the Jury weighed this dubious evidence accordingly.

## VIII. CONCLUSION

A jury's verdict is not a mere formality or triviality that can be brushed aside or otherwise dismissed at the whim of the losing party. The verdict in this case came about after several years of litigation, a first appeal to the Federal Circuit, remand to the District Court, six days of actual trial, and two and one-half days of deliberations. Any losing party can repeat its arguments and claim that a jury was unreasonable or failed to appreciate the arguments. But that is not the proper standard, and setting aside a jury verdict remains, as it should, one of the most drastic remedies to be used only in those infrequent cases where justice demands that it be done. This is not such a case.

Radio Systems had a full, fair and complete opportunity to present its witnesses and make its case. The District Court, at Radio Systems' urging, barred Mr. Lalor's infringement from testifying at trial, and Mr. Lalor could not afford an expert on invalidity. However,

the evidence was – and is – so compelling that Mr. Lalor was still able to convince a group of complete strangers that Claims 3 and 17 are valid and infringed.

More than ample evidence was presented at trial to support the Jury's verdict. Mr. Westrick, conceded, as he must, that none of the supposed prior art references expressly showed each of the elements recited by Claims 3 and 17. Indeed, given that the Jury actually invalidated several of Mr. Lalor's other patent claims, it can hardly be argued that the Jury blindly elected to support Mr. Lalor in all respects or otherwise failed to carry out its duty to deliberate and reach a unanimous verdict based on evidence actually presented. The two-and-one-half days of deliberation, combined with the "split decision" on validity is ample testimony that the Jury properly did its job in all respects.

For all the foregoing reasons, the verdict rendered by the Jury in this action is supported by substantial evidence, is not manifestly wrong and should not be set aside. Accordingly, the District Court's

ruling that Claims 3 and 17 are invalid should be vacated, and the Jury's verdict should be reinstated.


Dated: May 6, 2015                    Respectfully submitted


Philip P. Mann, WSBA No: 28860
Timothy J. Billick, WSBA No. 46690
MANN LAW GROUP
John Whitaker, WSBA No: 28868
WHITAKER LAW GROUP
1218 Third Avenue, Suite 1809
Seattle, Washington 98101
(206) 436-0900
*phil@mannlawgroup.com*
*john@wlawgrp.com*
*tim@mannlawgroup.com*

Attorneys for Plaintiff/Appellent
Mr. Tom Lalor

# ADDENDUM

# United States District Court

### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

RADIO SYSTEMS CORPORATION, et al

       Plaintiff,

  v.

LALOR et al,

       Defendant.

**SECOND AMENDED JUDGMENT IN A CIVIL CASE**

Case No.   C10-828 RSM

**___**    **Jury Verdict**. This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**_X_**    **Decision by Court**.  This action came to consideration before the Court.  The issues have been considered and a decision has been rendered.

THE COURT HAS ORDERED THAT: a Second Amended Judgment is entered in favor of Plaintiffs as reflected in the Court's Order Granting Plaintiff's Motion for Judgment as a Matter of Law and Denying Plaintiff's Motion to Correct Judgment and for Entry of Judgment on Inequitable Conduct.  Specifically, this Second Amended Judgment reflects that Claims 3 and 17 of the '082 patent are invalid as anticipated by prior art, resulting in the dismissal of the jury's verdict in favor Defendant as a matter of law. This Second Amended Judgment also reflects the denial of Plaintiffs' Motion for Entry of Judgment on Inequitable Conduct defense.

      Dated this 9th day of January 2015.

                           WILLIAM M. MCCOOL
                           Clerk

                           /s/ Rhonda Stiles
                           Deputy Clerk

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RADIO SYSTEMS CORPORATION and
INNOTEK, INC.,

          Plaintiffs,

          vs.

TOM LALOR, individually, and BUMPER
BOY, INC.,

          Defendants.

Case No. C10-0828RSM

ORDER GRANTING PLAINTIFFS'
MOTION FOR JUDGMENT AS A MATTER
OF LAW AND DENYING PLAINTIFF'S
MOTION TO CORRECT JUDGMENT AND
FOR ENTRY OF JUDGMENT ON
INEQUITABLE CONDUCT

## I.      INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) and Plaintiff's Motion to Correct Judgment and for Entry of Judgment on Inequitable Conduct.  Dkts. #197 and #207.

On their Motion for Judgment as a Matter of Law, Plaintiffs argue the jury's conclusion that Claims 3 and 17 are valid is not reasonable and is contrary both to the record evidence and to the jury's contemporaneous findings that Claims 1, 4, 6 and 15 are invalid.  *Id.*  In the alternative, Plaintiffs ask for a new trial on the issues of infringement on and invalidity of Claims 3 and 17.  *Id.* at 30-33.  Defendant responds that Plaintiffs ignore the cross-examination of Plaintiffs' own experts and the testimony of Defendant Lalor, both of which support the jury verdict.  Dkt. #210.  Defendant further argues that the Court should not order a new trial on issues related to Claims 3 and 17 because the jury's verdict on those claims comports with the

ORDER
PAGE - 1

evidence at trial. Dkt. #210 at 20-23. For the reasons stated herein, the Court disagrees with Defendant and GRANTS Plaintiffs' motion for judgment as a matter of law.

On their Motion to Correct Judgment and for Entry of Judgment on Inequitable Conduct, Plaintiff's first ask the Court to make the Judgment clear that royalties in the amount of $1.25 per collar sold is for future sales only. Dkt. #207. Plaintiffs also move the Court for an Order entering Judgment in their favor on their inequitable conduct claim, arguing that Defendant intentionally withheld material information from the patent examiner that would have precluded the issuance of his '082 patent had the examiner considered it. *Id.* Defendant responds that the information not provided to the examiner was not material because it was merely cumulative of other information already provided, and that Plaintiffs have failed to prove intent. Dkt. #217. For the reasons stated herein, the Court DENIES Plaintiffs' motion for entry of judgment on their inequitable conduct claim. The Court also DENIES their request to correct the judgment as MOOT.

## II.     BACKGROUND

This matter arises out of claims of patent infringement pertaining to certain technology used in electronic dog collars. On October 23, 2014, after a two week trial, the jury found that Plaintiff had infringed on Defendant's patent and that certain patent claims were not invalid, and awarded Defendant $612,500 in royalties and $1.25 for every collar unit sold in the future for the life of the patent. Dkt. #187. Specifically, the jury found that the collars at issue infringed on Claims 1, 3, 4, 6, 15 and 17 of Defendant's '082 patent, but that Claims 1, 4, 6 and 15 were invalid. Dkt. #187. As a result, damages were awarded based solely on the finding of validity of and infringement on Claims 3 and 17. *Id.*

ORDER
PAGE - 2

A3

The Court entered a Judgment regarding the same on November 6, 2014.  Dkt. #188. Several motions, including the instant ones, followed.  The Court has subsequently entered an Amended Judgment granting Defendant pre-judgment interest on the jury's damage award. Dkt. #220.

### III.    DISCUSSION

**A. Plaintiffs' Rule 50(b) Motion**

A motion for judgment as a matter of law after a jury verdict is rendered renews the moving party's prior Rule 50(a) motion for judgment as a matter of law at the close of all the evidence.  Fed. R. Civ. P. 50(b).  Judgment as a matter of law after the verdict may be granted only when the evidence and its inferences, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion as to the verdict.  *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).  Where there is sufficient conflicting evidence, or where reasonable minds could differ over the verdict, judgment as a matter of law after the verdict is improper.  *See, e.g., Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775 (9th Cir. 1990); *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181 (9th Cir. 1989).  It is well-settled that the standard for judgment as a matter of law is the same as the standard for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed.2d 105 (2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

*1.  Anticipation*

Plaintiffs first argue that Claim 3 of the '082 patent is invalid as anticipated by prior art, and no reasonable jury could have concluded otherwise.  A patent claim is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference expressly or inherently

ORDER
PAGE - 3

A4

discloses every limitation of the claim. *See, e.g., Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 975 (Fed. Cir. 2010). Anticipation challenges under § 102 must focus only on the limitations actually recited in the claims. *See Constant v. Adv. Micro-Devices, Inc.*, 848 F.2d 1560, 1570-71 (Fed. Cir. 1988) (finding "limitations [] not found anywhere in the claims" to be irrelevant to an anticipation challenge). Whether a reference discloses a limitation is a question of fact, and a jury's findings on questions of fact are reviewed for substantial evidence. *See, e.g., Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998). Because patents are presumed valid, invalidity by anticipation must be proven by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. L.P.*, 131 S. Ct. 2238, 2242, 180 L. Ed. 2d 131 (2011).

a. Claim 3 of U.S. Patent No. 7,267,082

This case involved both independent claims and dependent claims. As the Court instructed the jury, an "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Dkt. #186 at 16 (Instruction 14). Claims 1, 15 and 17 of the '082 patent are each independent claims. The remainder of the asserted claims in the '082 patent are "dependent claims" – namely, Claims 3, 4, and 6. *Id.*

Claim 3 depends from Claim 1 and states:

> The animal collar according to claim **1**, wherein said first electrode has a first electrode distal end opposite said first electrode base  and extending toward the animal during use, and wherein said second electrode has a second electrode distal end opposite said second electrode base and extending toward the animal during use, and wherein said first electrode distal end and said second electrode distal end are no more than 3/8 inch (0.95 cm) closer to the animal during use than said at least one high point surface.

Dkt. #199, Ex. 2 at col. 12, lns. 28-36 (bold in original). As a claim depending from Claim 1, Claim 3 incorporates all of the limitations of Claim 1. The jury found Claim 1 to be invalid.

A5

Dkt. #187. Thus, Claim 3 could be valid only if the remaining substantive limitations are independently patentable. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1320 (Fed. Cir. 2007). The jury was instructed in that regard. Dkt. #186 at 26 (Instruction 23).

Plaintiffs argue that the first and second substantive limitations of Claim 3 simply require that the first and second electrodes have distal ends opposite their bases. Dkt. #198 at 4. Plaintiffs also note that Claim 15 includes these limitations, and argue that, given Claim 15 was also found by the jury to be invalid, the only limitation of Claim 3 that could arguably be found to have introduced patentable subject matter is the third limitation – "wherein said first electrode distal end and said second electrode distal end are no more than 3/8 inch (0.95 cm) closer to the animal during use than said at least one high point surface." Dkt. #198 at 5.

As an initial matter, if a prior art reference teaches even a single point within a claimed range, the claim is invalid. *See In re Harris*, 409 F.3d 1339, 1343-44 (Fed. Cir. 2005); *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 782 (Fed. Cir. 1985). In other words, when a claim recites a range of measurements, the entire range is considered prior art if a single value within that range is found in the prior art. *Titanium Metals Corp. of Am.*, 778 F.2d at 782. The jury was instructed as much. Dkt. #186 at 30 (Instruction 27).

Given this legal authority and the evidence presented at trial, Plaintiffs argue that the '082 patent is invalid as anticipated by the Bonge patent ('516 Patent) and by the Elite Receiver. The Court agrees. At trial, Plaintiffs produced electronic dog collar expert Michael Westrick. *See* Dkts. #175-#176. Mr. Westrick testified that all of the limitations of Claim 3 of the '082 patent, as construed by this Court, are disclosed in Bonge. Dkt. #192 at 52:1-63:10. With respect to the relational distance between the distal ends of the electrodes and the high point surfaces, Mr. Westrick testified that the Bonge patent showed distal ends of electrodes

ORDER
PAGE - 5

A6

that do not extend any further than 3/8 inch beyond the high point surfaces. Dkt. #192 at 62:18-63:10. Similarly, Mr. Westrick testified that all of the limitations of Claim 3 of the '082 patent, as construed by this Court, are disclosed by the Elite Receiver. Dkt. #192 at 113:3-115:3. With respect to the relational distance between the distal ends of the electrodes and the high point surfaces, Mr. Westrick testified that the distal ends of the electrodes do not extend at all beyond the high point surfaces. *Id.* at 114:11-115:1.

Defendant did not present any experts of his own. Rather, he relied on his cross-examination of Plaintiffs' experts. With respect to the Bonge patent, Defendant argues that Mr. Westrick made numerous concessions regarding Bonge on cross-examination, and that it is clear the jury placed more weight on his cross-examination than on his direct testimony, ultimately determining that Claim 3 of the '082 patent was not anticipated by Bonge. In particular, Defendant argues that Mr. Westrick's concessions support that: 1) there are no dimensions disclosed by Bonge; 2) it is unclear whether Points D and E on the illustrative exhibit are part of the collar housing; and 3) the distal ends of the electrodes could have been higher than the alleged high point surfaces. Dkt. #210 at 5-6. As a result, Defendant argues, the jury could have reasonably found that the Bonge reference did not clearly and convincingly anticipate Claim 3 of the '082 patent.

The Court does not agree with Defendant's characterization of Mr. Westrick's testimony regarding the Bonge patent. In fact, Mr. Westrick's testimony on cross-examination was consistent with his direct testimony. He testified about the collar housing and where the straps passed through the housing, concluding that the collar housing was enclosed. Dkt. #192 at 155:13-160:21. He also testified that the distal ends of the electrodes would make contact with the skin of the dog, even though the ends are below the high point surfaces of the collar.

ORDER
PAGE - 6

A7

*Id.* at 162:14-24.  He further testified that while electrodes could be screwed onto the threaded electrodes seen in the Bonge drawings, one could also use the threaded electrodes to screw on retaining nuts.  *Id.* at 164:13-165:14.  This supports his direct testimony that the Bonge patent showed distal ends of electrodes that do not extend any further than 3/8 inch beyond the high point surfaces.  Dkt. #192 at 62:18-63:10.  The Bonge drawings themselves also support the testimony.  *See* Dkt. #199, Trial Exhibit 42 at Figures 12-13.

With respect to the Elite Receiver, Defendant argues that the Elite Receiver was considered by the patent examiner and the patent issued anyway, which could have led the jury to conclude that Claim 3 of the '082 patent was not anticipated by the Elite Receiver.  Dkt. #210 at 10.  Defendant further argues that Mr. Westrick made several concessions with respect to the Elite Receiver that supports the jury's conclusions.  Dkt. #210 at 11-13.  The Court disagrees with Defendant.

First, the record does not contain conclusive evidence that the patent Examiner considered the Elite Receiver.  In fact, on the face of the patent, the Elite Receiver is not referenced.  *See* Dkt. #199, Trial Exhibit 2.  However, even assuming that the Examiner considered the Elite Receiver, Mr. Westrick's testimony to the jury made clear that all of the limitations of Claim 3 of the '082 patent, as construed by this Court, are disclosed by the Elite Receiver.  Dkt. #192 at 113:3-115:3.  "The dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was disclosed in that single reference." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003) (internal quotation marks and alterations omitted).  Mr. Westrick established that he is one of ordinary skill in the art.  Dkt. #192 at 24:9-12 and 29:10-17.

ORDER
PAGE - 7

A8

Defendant also argues that Mr. Westrick's concessions with respect to other patents referenced by the patent examiner in the '082 patent, provide substantial evidence that Claim 3 was not anticipated by the Elite Receiver. Specifically, Defendant argues that Mr. Westrick conceded that the Elite Receiver was analogous to the Christianson patent (Patent No. 5,815,077) and Peterson patent (Patent No. 6,712,025), and because the patent examiner referenced those patents and issued the patent anyway, the jury could use that as evidence that Claim 3 of the '082 patent was not anticipated by the Elite Receiver. Dkt. #210 at 12-13. Again, Defendant mischaracterizes Mr. Westrick's testimony. Indeed, on cross-examination Mr. Westrick denied that the Elite Receiver was analogous to the Christianson patent:

> Q. (By Mr. Mann) Okay. Now, if we go to Christiansen, we see, more or less, that exact concept. We have a line coming through the electrode, you have a perpendicular line across the base, and the portion, I guess on this one, would be X, that's a high point surface because it extends somewhat above this horizontal line?
>
> A. This is not even a close analogy. The collar box is on the outside of the collar. **This is probably one of the worst comparisons I've ever seen**.

Dkt. #192 at 192:6-14 (emphasis added). After additional questioning, he simply conceded that the two patents both met the definition of "high point surfaces" as set forth in Claim 15 of the '082 patent as construed by the Court. *Id.* at 192:15-193:14.

With respect to the Peterson patent, cross-examination merely established that the patent examiner had referenced Peterson and allowed the '082 patent to issue anyway. Dkt. #192 at 197:3-6. Defense counsel never actually established with Mr. Westrick whether he believed that the Elite Receiver and the Peterson collar were analogous in any way. *See* Dkt. #192 at 194:5-197:6.

As a result, the Court disagrees with Defendant and finds that the record allows only one reasonable conclusion in this case: clear and convincing evidence establishes that both

ORDER

PAGE - 8

A9

Bonge and the Elite Receiver anticipate Claim 3 of the '082 patent. The record lacks substantial evidence to support the jury's finding to the contrary.

b. Claim 17 of U.S. Patent No. 7,267,082

Plaintiffs next argue that the jury's conclusion that Claim 17 of the '082 patent is valid was not reasonable given the jury's conclusion that Claim 6 is invalid, and in light of prior art. Dkt. #198 at 23-24. More specifically, Plaintiffs argue that Claim 17 of the '082 patent is invalid because it was anticipated by Bonge and the Elite Receiver, as well as the Juliana patent (Patent No. Des. 330, 173) and its commercial embodiment, and the Duncan patent (Patent No. 6,052,097). Dkt. #198 at 23-30. The Court agrees.

Claim 17 of the '082 patent reads:

> An animal collar designed for attachment to an animal, the collar having a stimulating unit for generating a stimulus and first and second electrodes directed toward the animal during use for transferring the stimulus to the animal, the collar comprising:
>
> > a collar housing for containing the stimulating unit and for supporting the electrodes, said collar housing having an inside surface designed for contacting the skin of the animal during use, the first electrode intersecting said inside surface at a first electrode base, and the second electrode intersecting said inside surface at a second electrode base;
> >
> > said inside surface having at least one high point surface extending above at least one of said first electrode base and said second electrode base and toward the animal during use;
> >
> > said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.

Dkt. #199, Trial Exhibit 2 at col. 14, lns. 17-38. As the jury was instructed, this is an independent claim. Dkt. #186 at 16 (Instruction 14).

ORDER
PAGE - 9

A10

While this Claim is independent, the Court examines the record as a whole to determine whether substantial evidence supports the jury's conclusions. Significantly, the jury determined that Claim 1 and Claim 6 of the '082 patent are invalid. Dkt. #187. The only limitation that is contained in Claim 17, that is not contained in either Claim 1 or Claim 6, is the requirement that the inside surface be "designed for contacting the skin of the animal during use." *See* Dkt. #199, Trial Exhibit 2 at col. 12, lns. 7-24 and 43-47. As a result, the jury must have concluded that this limitation contained sufficiently patentable material so as not to invalidate this claim.

Such a conclusion is not reasonable in light of the evidence in the record with respect to prior art. As with Claim 3, at trial Plaintiffs produced Mr. Westrick as an expert witness. Mr. Westrick testified that all of the limitations of Claim 17 are disclosed in Bonge. Dkt. #192 at 71:7-75:17. Mr. Westrick testified specifically that the inside surface of the Bonge collar housing could contact the skin of the animal during use. *Id.* at 73:1-16. Defendant produced no expert witness of his own. On cross-examination, Mr. Westrick testified that some "down[ward]" portion of the inside surface would not touch the animal's skin during use. *Id.* at 160:17-21. However, on re-direct, he made clear that the portion of the collar housing engaging the collar straps would have to be wider than the strap, and therefore there would be some portions of the inside surface of the collar housing that would contact the skin of the animal during use. *Id.* at 202:4-19.

Defendant also argues that Bonge does not invalidate Claim 17 because the "high points" in the Bonge drawings do not support any electronics. The Court agrees with Plaintiffs that this argument is frivolous. Nothing in Claim 17 specifically requires the high point surfaces to support electronics. Likewise, Defendant's argument that the high point surfaces in

ORDER
PAGE - 10

A11

Bonge are not "designed" for the purpose of contacting the animal's skin is also frivolous. Where the prior art inherently performs the claimed function, the prior art need not specifically recognize that the design performs the particular function or intend that it be performed. *See Verdegaal Bros. Inc. v. Union Oil Co.*, 814 F.2d 628, 633 (Fed. Cir. 1987) ("In any event, Union Oil's burden of proof was limited to establishing that Stoller disclosed the same process. It did not have the additional burden of proving that Stoller recognized the heat sink capabilities of using a heel. Even assuming Stoller did not recognize that the heel of his process functioned as a heat sink, that property was inherently possessed by the heel in his disclosed process, and, thus, his process anticipates the claimed invention.").

For all of these reasons, the Court finds that the record allows only one reasonable conclusion in this case with respect to Claim 17 of the '082 patent: clear and convincing evidence establishes that Bonge anticipates Claim 17, and the record lacks substantial evidence to support the jury's finding to the contrary.

### 2. Obviousness

Based on the Court's conclusions regarding anticipation, above, it does not reach Plaintiffs' arguments regarding obviousness.

### B. Plaintiff's Motion for Entry of Judgment on Inequitable Conduct

The Court now turns to Plaintiffs inequitable conduct defense. Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). It is reserved to the discretion of the trial court.[1]  *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1474, 1584 (Fed. Cir. 1995). To prevail on the defense of inequitable conduct, the

---

[1]  The Jury provided a unanimous advisory finding that the '082 patent was not unenforceable by reason of inequitable conduct. Dkt. #187.

ORDER
PAGE - 11

A12

accused infringer must prove by clear and convincing evidence that the applicant misrepresented or omitted material information with the specific intent to deceive the Patent Office. *Id.* A finding that the misrepresentation or omission amounts to gross negligence or negligence under the "should have known" standard does not satisfy the intent requirement. *Id.* at 1290. Intent and materiality are separate requirements that must each be satisfied. *Id.* Where an inequitable conduct claim is based on failure to disclose a reference, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a material reference. *Id.* at 1290. Prior art is material if the Patent Office would not have allowed a claim had it been aware of the undisclosed reference. *Id.* at 1291-92.

### 1. Findings of Fact

Plaintiffs have presented proposed Findings of Fact for adoption by this Court. Dkt. #208, Proposed Order. Defendant has not responded specifically to these Proposed Facts, but has included a discussion of the facts in his opposition brief. *See* Dkt. #217 at 2-4. Defendant's "salient facts" largely comport with Plaintiffs' proposed facts. Accordingly, the Court adopts the following finding of facts:

**(A) The Elite Receiver Design**

1. In 1997, Innotek designed an animal collar that has come to be known as the "Elite Receiver." Dkt. #192 at 98:19-105:20; Dkt. #191 at 13:18-20; Dkt. #199, Trial Exhibits 12, 27, 38 and 75.

2. Innotek employees Matt Williams and Michael Westrick were both involved in the engineering and design of the Elite Receiver in or around 1997. Dkt. #192 at 99:3-100:24; Dkt. #199, Trial Exhibits 12, 38, and 75.

ORDER
PAGE - 12

A13

3.  A working prototype of the Elite Receiver was produced in late 1997 or early 1998. A photograph of the working prototype is shown below.  Dkt. #192 at 99:15-100:5; Dkt. #191 at 14:1-14 and 16:18-19; Dkt. #199, Trial Exhibits 12, 38, and 75.



4.  The Elite Receiver prototype was produced using injection mold panels, which are shown in the photograph below.  Dkt. #192 at 101:15-103:4; Dkt. #191 at 15:8-16:17; Dkt. #199, Trial Exhibit 27.



5.  The Elite Receiver prototype included a working stimulating unit and a working Receiver unit taken from a Command Series Receiver collar model manufactured and sold by Innotek at the time.  Dkt. #192 at 99:22-25 and 117:4-9; Dkt. #191 at 16:20-17:11; Dkt. #199, Trial Exhibits 12 and 75.

6.  The Elite Receiver prototype worked satisfactorily for its intended purpose.  Dkt. #192 at 100:1-5; Dkt. #191 at 36:1-37:4; Dkt. #199, Trial Exhibits 12 and 75.

ORDER
PAGE - 13

A14

7.   Shortly after being made, the Elite Receiver design and prototype were shown to third parties who were under no obligation of confidentiality.  Dkt. #192 at 103:17-105:20; Dkt. #191 at 17:12-18:2; Dkt. #199, Trial Exhibits 12 and 75.

8.   The Elite Receiver prototype was given to Ed Rader for purposes of field testing the prototype and to evaluate the marketability of the design. Mr. Rader was not an employee of Innotek and was under no obligation of confidentiality.  Dkt. #192 at 104:8-105:1; Dkt. #191 at 17:12-18:2.

**(B)  Mr. Lalor's and Bumper Boy's 2005 Allegations of Infringement**

9.   On August 5, 2003, Mr. Lalor filed a patent application that eventually issued on December 14, 2004 as U.S. Patent No. 6,830,014 ("the '014 Patent").  Dkt. #208, Trial Exhibit 1.

10.   On May 28, 2004, Mr. Lalor's counsel sent him a letter discussing various animal collars in the light of the '014 Patent. In the letter, Mr. Lalor's counsel opined that "it seems clear that [the claims of the '014 Patent] would prevent anyone from making, using or selling a dog collar having a collar housing that is anything but flat."  Dkt. #208, Trial Exhibit 26.

11.   On February 21, 2005, Mr. Lalor and Defendant Bumper Boy, Inc. ("Bumper Boy"), through counsel, sent Innotek a letter accusing it of infringing the '014 Patent by making and selling its UltraSmart collar.  Dkt. #204, Trial Exhibit 10.

12.   Counsel for Innotek responded to the letter on April 29, 2005, by informing Mr. Lalor and Bumper Boy that Innotek was in possession of prior art that would invalidate the '014 Patent.  Dkt. #199, Trial Exhibit 12.

13.   Attached to Innotek's April 29, 2005, letter was a photograph of the Elite Receiver prototype, dated technical illustrations of the Elite Receiver design, and illustrations of the

ORDER
PAGE - 14

corresponding mold panel design used to produce the prototype, along with four declarations from individuals with knowledge of the design, engineering, and public disclosure of the Elite Receiver.  Dkt. #199, Trial Exhibit 12.

**(C) The '082 Patent Application**

14.  Mr. Lalor and his counsel prepared a continuation-in-part patent application and filed it in the Patent and Trademark Office on December 30, 2005, basing priority on an application co-pending with that of the previously issued '014 Patent.  The continuation-in-part application eventually issued as the '082 Patent.  Dkt. #200 at 46:13-21 and 65:8-13; Dkt. #191 at 37:5-8; Dkt. #199, Trial Exhibit 2.

15.  Among the materials filed with the '082 Patent application was an Information Disclosure Statement ("IDS") dated December 30, 2005.  The information Mr. Lalor received on the Elite Receiver, however, was not included on the December 30, 2005 IDS filed by Mr. Lalor's counsel.  Dkt. #193 at 29:25-31:20; Dkt. #208, Trial Exhibit 121.

16.  A month after filing the '082 Patent application, Mr. Lalor's Canadian patent counsel, Barry Hutsel, confirmed the filing of the application in a letter to Mr. Lalor dated January 25, 2006.  According to Mr. Hutsel, the purpose of preparing and filing the '082 Patent application was to "secure claims of sufficient scope to cover the [UltraSmart] collar being produced by Innotek and yet to avoid invalidity based on their earlier product."  In this same letter, Mr. Hutsel warned Mr. Lalor that "Failure to disclose all known relevant prior art to the U.S. Patent Office could result in the subsequent invalidation of your patent rights."  Dkt. #204, Trial Exhibit 127 (emphasis in original).

17.  On July 21, 2006, Mr. Lalor filed a second IDS in the Patent and Trademark Office for the '082 Patent application.  The second IDS identified the same prior art as the first IDS;

ORDER
PAGE - 15

however, information about the Elite Receiver was not included in the second IDS. Dkt. #193 at 33:1-34:11; Dkt. #208, Trial Exhibit 121.

18. On December 11, 2006, the Patent and Trademark Office issued a Notice of Allowability, followed by a Notice of Allowance on January 3, 2007. Dkt. #193 at 34:12-35:7; Dkt. #208 at Trial Exhibit 121.

19. Mr. Lalor and his counsel partially disclosed the Elite Receiver to the Patent and Trademark Office in a third IDS dated January 11, 2007. They failed, however, to submit either the required statement under 37 C.F.R. § 1.97(e) or the required fee for submission of an IDS after a Notice of Allowance has issued. *See* 37 C.F.R. § 1.97(d). Dkt. #193 at 35:8-39:21; Dkt. #208, Trial Exhibits 121 and 124.

20. Further, in filing the third IDS, Mr. Lalor and his counsel excluded the four declarations concerning the design, engineering, and public disclosure of the Elite Receiver. Only the photograph of the Elite Receiver prototype and the dated technical illustrations of the design were disclosed to the Patent and Trademark Office. Dkt. #193 39:22-43:4; Dkt. #208, Trial Exhibits 121 and 124.

21. On the third IDS, Mr. Lalor and his counsel included the following description of the Elite Receiver photograph and illustrations: "INNOTEK photograph and drawings of animal collar asserted by Innotek to have been developed in 1997, shown in 1998, but never sold." This description failed to disclose the contents of the four declarations. Dkt. #193 at 37:10-14; Dkt. #208, Trial Exhibits 121 and 124.

22. Mr. Hutsel appeared to understand that the third IDS was untimely. On January 22, 2007, he sent Mr. Lalor a letter in which he stated that "the IDS will not be considered by the Examiner in this case, but will be part of the Patent Office file." Dkt. #208, Trial Exhibit 129.

23. On May 25, 2007, the Patent Office sent Mr. Lalor's U.S. counsel notification that the January 16, 2007, IDS was "NON-COMPLIANT" and would not be considered. Dkt. #193 at 38:22-39:3; Dkt. #208, Trial Exhibits 121 and 125.

24. Mr. Lalor's U.S. counsel forwarded the notification to Mr. Hutsel in a letter dated May 31, 2007, stating "[a]s previously discussed, this Notice indicates that the IDS we submitted for the INNOTEK Photographs, which were submitted after the Notice of Allowance, will be placed in the file but were not considered by the Office." Dkt. #208, Trial Exhibit 130.

25. Mr. Lalor and his counsel could have filed a continuation patent application prior to paying the issue fee on the '082 Patent Application. Doing so would have reopened the patent prosecution and afforded additional time for Mr. Lalor and his counsel to disclose prior art to the PTO. Dkt. #193 at 39:10-21). Mr. Lalor did not do so.

26. The record is not clear whether the third IDS actually was considered by the Examiner during prosecution of the '082 Patent. The '082 Patent's file history suggests that the examiner may have considered the incomplete third IDS, notwithstanding that it was not timely filed. Dkt. #208, Trial Exhibit 122.

27. Mr. Lalor's counsel paid the issue fee for the '082 Patent application on March 30, 2007. Dkt. #208, Trial Exhibit 121.

28. The '082 Patent issued on September 11, 2007. Dkt. #199, Trial Exhibit 2.

29. The Elite Receiver is not included among the "Cited References" listed on the face of the '082 Patent. *Id.*

30. Claim 1 of the '082 Patent reads as follows:

An animal collar designed for attachment to an animal, comprising:

ORDER
PAGE - 17

A18

a collar housing having an inside surface directed toward the animal during use;

a first electrode directed toward the animal during use,

said first electrode intersecting said inside surface at a first electrode base;

and a second electrode directed toward the animal during use, said second electrode intersecting said inside surface at a second electrode base;

said inside surface having at least one high point surface extending above at least one of said first electrode base and said second electrode base and toward the animal during use;

said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.

*Id.*, Col. 12, lines 7-24).

2. *Conclusions of Law*

**(A) Materiality**

As an initial matter, the Court concludes, in favor of the non-moving party, that the information disclosed in the third IDS was reviewed by the examiner. At the very least, the record is unclear as to whether it was considered, and therefore the Court cannot find substantial evidence that it was not considered. However, there is no dispute that the four declarations discussing, *inter alia*, the dates and production of the Elite Receiver, were not presented to the Patent Examiner. Thus, the Court now examines that information.

To determine materiality on allegations that prior art has been withheld, the Court applies a 'but-for' standard. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011). The Federal Circuit has defined this standard as follows:

A prior art reference "is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." Unlike the clear and

ORDER
PAGE - 18

A19

> convincing evidence standard for invalidating a patent in the district court
> under 35 U.S.C. §§ 102 and 103, the standard for establishing but-for
> materiality in the inequitable conduct context only requires a preponderance
> of the evidence, "giv[ing] claims their broadest reasonable construction."
> As a result, when a "claim is properly invalidated in district court based on
> the deliberately withheld reference, then that reference is necessarily
> material" for purposes of the inequitable conduct inquiry.  On the other
> hand, even if the withheld reference is not sufficient to invalidate the claim
> in district court, "the reference may be material if it would have blocked
> patent issuance under the PTO's different evidentiary standards."

*Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012) (quoting

*Therasense*, 649 F.3d at 1291-92).  Further, a prior art reference is material for purposes of the

inequitable conduct defense if any one of the claims that issued would not have been allowed in

view of the reference.  *See Stauffer Chem. Co. v. Monsanto Co.*, 623 F. Supp. 148, 150 (Fed.

Cir. 1985).

At trial, Plaintiffs presented expert witness Peter Chu.[2]  *See* Dkt. #193.  Mr. Chu is a

patent attorney and former Patent Examiner.  *Id.* at 3:16-21 and 5:5-14.  Mr. Chu testified that

the failure to disclose the declarations violate Defendant's duty to disclose all material

information to the Patent Examiner.  Dkt. #193 at 44:21-45:9. These documents were also

pertinent to the question of whether the Elite Receiver qualified as prior art.  *See* Dkt. #193 at

69:15-70:18 and 78:22-79:18.   Defendant argues that there was no need to disclose the

declarations because they were "merely cumulative" of the information he had already

provided.   Dkt. #217 at 7-8.   However, Mr. Chu rejected this assertion, noting that the

declarations were important to support the technical drawings provided to the Patent Examiner.

Dkt. #193 at 75:1-14.  Having examined the declarations, the Court agrees that they are not

---

[2]   Defendant argues that Plaintiffs' motion should be barred because the disclosure of expert
witness Peter Chu's opinions at trial were untimely.  Dkt. #217 at 4-6.  These objections were
raised during trial and were rejected by the Court.  *See* Dkt. #193 at 41-43.  The Court does not
reverse its prior ruling here.

ORDER
PAGE - 19

merely cumulative of the other information submitted pertaining to the Elite Receiver. As a result, the Court concludes that the declarations were also material.

**(B) Intent to Deceive**

The Court next addresses whether there is sufficient evidence to find that Mr. Lalor or his attorneys acted with the intent to deceive when failing to disclose the aforementioned declarations. The Court finds there is no such evidence.

As noted above, intent and materiality are separate requirements. *Hoffmann-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003). "A district court should not use a 'sliding scale,'" where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. *Therasense*, 649 F.3d at 1290. Moreover, as the Federal Circuit has explained, a district court may not infer intent solely from materiality. *Id.* "Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.* (citation omitted).

Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1340 (Fed. Cir. 2009). However, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (citation omitted). Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Id.* Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528

ORDER
PAGE - 20

F.3d 1365, 1376 (Fed. Cir. 2008) ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

Because the party alleging inequitable conduct bears the burden of proof, the "patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Star*, 537 F.3d at 1368. The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive. *Therasense*, 649 F.3d at 1291.

Here, with respect to their argument that Mr. Lalor or his attorneys acted with the intent to deceive the Patent Office, Plaintiffs simply presented Mr. Chu's own inference of such intent. Dkt. #193 at 45:10-25. Mr. Lalor did not testify with regard to this issue. *See* Dkt. #194. Mr. Lalor's patent counsel were not witnesses in this case. On this evidence, there is simply not enough for the Court to find that Mr. Lalor or his counsel acted with an intent to deceive.

Accordingly, the Court finds that Plaintiffs' inequitable conduct defense fails to render the '082 patent unenforceable, and agrees with the jury's advisory opinion finding the same.

### C. Plaintiff's Motion for Correction of Judgment

Given the decisions set forth above, Plaintiffs' request to correct the judgment to more reflect the jury's award of future damages is now moot.

### IV. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby ORDERS:

1) Plaintiffs' Motion for Judgment as a Matter of Law (Dkt. #197) is GRANTED.

ORDER
PAGE - 21

A22

2) Plaintiff's Motion to Correct Judgment and for Entry of Judgment on Inequitable Conduct (Dkt. #207) is DENIED.

3) The Court shall VACATE the first Amended Judgment in favor of Defendant and ENTER a SECOND AMENDED JUDGMENT in favor of Plaintiffs as reflected above.  Specifically, the Second Amended Judgment shall reflect that Claims 3 and 17 of the '082 patent are invalid as anticipated by prior art, resulting in the dismissal of the jury's verdict in favor Defendant as a matter of law.  The Second Amended Judgment shall also reflect the denial of Plaintiffs' Motion for Entry of Judgment on their Inequitable Conduct defense.

DATED this 9th day of January 2015.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 22

A23

US007267082B2

(12) **United States Patent**

Lalor

(10) **Patent No.:**     **US 7,267,082 B2**

(45) **Date of Patent:**     **Sep. 11, 2007**

(54) **ANIMAL COLLAR**

(76) Inventor:  **Tom Lalor**, 122 Garden Avenue, North Vancouver, British Columbia (CA) V7P 3H2

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/324,047**

(22) Filed:  **Dec. 30, 2005**

(65)  **Prior Publication Data**

US 2006/0112905 A1    Jun. 1, 2006

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/979,714, filed on Nov. 2, 2004, which is a continuation-in-part of application No. 10/634,467, filed on Aug. 5, 2003, now Pat. No. 6,830,014.

(51) **Int. Cl.**
*A01K 29/00*     (2006.01)

(52) **U.S. Cl.** ...................................................... **119/859**

(58) **Field of Classification Search** ....... 119/718–721, 119/859, 862, 908, 905; 340/573.1, 573.3
See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,559,498 A | 9/1996 | Westrick et al. | 340/573 |
| 5,605,116 A | 2/1997 | Kim et al. | 119/720 |
| 5,636,597 A | 6/1997 | Van Curen et al. | 119/720 |
| 5,799,618 A | 9/1998 | Van Curen et al. | 119/721 |
| 5,815,077 A * | 9/1998 | Christiansen | 340/573.3 |
| 5,911,198 A | 6/1999 | Van Curen et al. | 119/720 |
| 5,913,284 A | 6/1999 | Van Curen et al. | 119/720 |
| 5,923,254 A | 7/1999 | Brune | 340/573.3 |

| | | | |
|---|---|---|---|
| 5,934,225 A | 8/1999 | Williams | 119/859 |
| D417,835 S | 12/1999 | Williams | D8/356 |
| 6,058,889 A | 5/2000 | Van Curen et al. | 119/721 |
| 6,073,589 A | 6/2000 | Van Curen et al. | 119/720 |
| 6,163,261 A | 12/2000 | Westrick | 340/573.3 |
| 6,184,790 B1 | 2/2001 | Gerig | 340/573.3 |
| 6,327,999 B1 | 12/2001 | Gerig | 119/712 |
| 6,360,697 B1 | 3/2002 | Williams | 119/720 |
| 6,431,122 B1 | 8/2002 | Westrick et al. | 119/721 |
| 6,459,378 B2 | 10/2002 | Gerig | 340/573.3 |
| 6,598,563 B2 * | 7/2003 | Kim et al. | 119/720 |
| 6,606,967 B1 * | 8/2003 | Wolfe et al. | 119/856 |
| 6,712,025 B2 | 3/2004 | Peterson et al. | 119/721 |

* cited by examiner

*Primary Examiner*—Thomas Price
(74) *Attorney, Agent, or Firm*—Jeffrey S. Sokol; Cook & Franke S.C.

(57)  **ABSTRACT**

An electronic animal collar designed to reduce the load applied to the animal=s neck by one or more stimulating electrodes or sensors that extend from or through an inside surface of the collar housing into the skin of the animal during use, and to permit the collar to be securely fastened to the neck of the animal without risk of causing discomfort or damage to the skin of the animal due to pressure from the stimulating electrodes. The inside surface of the collar housing has one or more high point surfaces that are raised to extend the inside surface above the base of the stimulating electrodes or sensors toward the animal during use so as to increase contact between the inside surface and the animal=s skin and to thereby relieve and distribute the load caused by collar tension around the animal=s neck over a larger contact friction area. A connecting strap for connecting the electronic collar to the animal includes a stretchable insert to ensure good electrode/skin contact and provide comfort for the animal.

**18 Claims, 8 Drawing Sheets**





**FIG. 1**



**FIG. 2**



FIG. 3



PRESSURE POINTS

CONTACT
FRICTION
AREAS

FIG. 4



FIG. 5

FIG. 6

Small Dog

Medium Dog

Large Dog

FIG. 7



**FIG. 8**



**FIG. 9**



**FIG. 10**

**FIG. 11**



**FIG. 12**



**FIG. 13**



**FIG. 14**



**FIG. 15**

**1**

## ANIMAL COLLAR

### CROSS REFERENCE TO RELATED APPLICATION(S)

This application is a Continuation-In-Part of U.S. Patent application Ser. No. 10/979,714, filed Nov. 2, 2004, which in turn is a Continuation-In-Part of U.S. patent application Ser. No. 10/634,467, filed Aug. 5, 2003 now issued as U.S. Pat. No. 6,830,014 on Dec. 14, 2004.

### BACKGROUND OF THE INVENTION

The present description relates to animal collars, and in particular to dog collars of the type that have one or more electrodes or sensors which protrude from the inside surface of the collar for contacting the neck of the animal and electronic devices located within the body of the collar to receive electronic control signals or sensor input and to generate a stimulus, which is transmitted to the animal through the electrodes or by a speaker on the collar.

### SUMMARY OF THE INVENTION

Various electronic animal collar-type training aids are known for enabling an animal trainer to encourage or discourage certain behaviour in animals, such as dogs. The devices may be used to discourage barking or digging, or contain the animal within a defined area.

Generally, the trainer uses a transmitter capable of sending electronic signals, such as radio frequency (RF) signals, to a receiver unit contained within a boxlike enclosure strapped around the animal's neck (see FIG. 1—Prior Art). The transmitter may be a stationary boundary unit, a stationary centrally located unit, or a portable transmitter carried by the trainer as part of a remote control unit. Also contained within the boxlike enclosure strapped to the animal are a power supply and a signal generator for generating a stimulus (normally an electric stimulus) that is transmitted to the animal through one or more electrodes, which protrude from the inside surface of the boxlike enclosure and press into the neck of the animal. In response to signals received by the receiver from the transmitter, a voltage is applied to the one or more electrodes to provide an electric stimulation to the animal when it exhibits undesirable behaviour. A device of this type is shown in FIG. 1 of the present application and is also shown and described in U.S. Pat. No. 6,327,999, issued to Duane A. Gerig on Dec. 11, 2002.

As shown in FIGS. 1 and 2, currently available animal collars 1 generally comprise a boxlike collar housing 2 attachable to the animal's neck using strap 3. One or more electrodes 4 typically protrude from an inside surface 5 of boxlike collar housing 2 between ⅜ inch (0.95 cm) and ¾ inch (1.9 cm). Electrodes 4 generally have contact points approximately ⅛ inch (0.32 cm) in diameter. One problem with such collars, is that their effectiveness is limited by the amount of contact that can be obtained between electrodes 4 and the animal's skin 6. Getting the proper tension on the collar requires considerable experience and many inexperienced trainers over tighten or under tighten the devices around the animal's neck. The problem with the electronic collars of the prior art is that 90% of the tensioning load is concentrated on the tiny electrodes 4, which jab into the animal's neck. This causes animal discomfort, and over time, the electrodes can harm the animal by causing sores. If the collars are worn loosely, sufficient electrode-skin

**2**

contact can be lost when the animal runs or shakes itself, especially when the animal becomes wet.

So called "no-bark collars" of the prior art are similar to the electronic collars described above, and shown in FIGS. 1 and 2, except, in place of the receiver/transmitter combination, no-bark collars have a bark sensor generally located on inside surface 5. The bark sensor is similar to the one or more electrodes 4 and is designed to contact the animal's neck and detect vibrations associated with barking. When such vibrations are detected, an electric stimulus is transmitted to the animal through the one or more electrodes 4 to deter the barking behaviour.

No-bark collars and other similar collars used in various animal containment systems or animal training systems, suffer from the same disadvantages described above.

It would therefore be advantageous if an electronic collar device was developed that could permit sufficient electrode-skin contact to allow the device to be effective, and yet provide comfort to the animal and prevent damage and sores.

It is an object of one aspect of the applicant's animal collar described herein to provide an animal collar that overcomes one or more of the above shortcomings.

It is an object of another aspect to provide an animal collar that reduces and distributes the tensioning load applied to the animal's neck by the stimulating electrodes or sensors.

It is an object of another aspect to provide an animal collar that can be securely fastened to the neck of the animal and that reduces the risk of causing discomfort or damage to the skin of the animal due to pressure from the stimulating electrodes or sensors.

It is an object of a further aspect to provide a strap for attaching an animal collar to an animal, the animal collar having at least one electrode extending toward the animal during use, the strap designed to maintain good electrode/skin contact while at the same time improving animal comfort.

Briefly, the applicant's animal collar described herein provides an electronic animal collar designed to reduce the load applied to the animal's neck by one or more stimulating electrodes or sensors that extend from or through an inside surface of the collar housing into the skin of the animal during use, and to permit the collar to be securely fastened to the neck of the animal without risk of causing discomfort or damage to the skin of the animal due to pressure from the stimulating electrodes. The inside surface of the collar housing has one or more high point surfaces that extend the inside surface above the electrode base and towards the animal so as to relieve and distribute the load caused by collar tension around the animal's neck over a larger contact friction area. The high point surfaces intersect with a notional 90-degree plane extending from any point, located above the electrode or sensor base where it intersects with the inside surface of the collar housing, on a central longitudinal axis of any of the one or more electrodes or sensors. In another aspect, the connecting strap for the applicant's animal collar includes a stretchable insert, which automatically adjusts the collar to the correct tightness regardless of the user's skill in securing the collar to the animal. In addition, the stretchable insert will extend and tighten in response to the animal's movements, such as flexing the neck muscles, heavy breathing or barking, thus maintaining proper collar tension and electrode-skin contact at all times.

According to one aspect of the applicant's animal collar, there is provided an animal collar designed for attachment to an animal, comprising: a collar housing having an inside surface directed toward the animal during use; a first electrode directed toward the animal during use, the first elec-

US 7,267,082 B2

**3**

trode intersecting the inside surface at a first electrode base; and a second electrode directed toward the animal during use, the second electrode intersecting the inside surface at a second electrode base; the inside surface having at least one high point surface extending above at least one of the first electrode base and the second electrode base and toward the animal during use; the at least one high point surface located outside of a central area of the housing, the central area located between the first electrode base and the second electrode base.

According to another aspect of the applicant's animal collar, there is provided an animal collar designed for attachment to an animal, comprising: a collar housing having an inside surface directed toward the animal during use; a first electrode directed toward the animal during use, the first electrode intersecting the inside surface at a first electrode base, the first electrode having a first central longitudinal axis extending toward the animal during used from the first electrode base to an opposite first distal end; and a second electrode directed toward the animal during use, the second electrode intersecting the inside surface at a second electrode base, the second electrode having a second central longitudinal axis extending toward the animal during used from the second electrode base to an opposite second distal end; the inside surface having at least one high point surface designed to intersect with a notional 90-degree plane extended from a point on at least one of the first central longitudinal axis and the second longitudinal axis; the at least one high point surface located outside of a central area of the housing, the central area located between the first electrode base and the second electrode base.

According to a further aspect of the applicant's animal collar, there is also provided an animal collar designed for attachment to an animal, the collar having a stimulating unit for generating a stimulus and first and second electrodes directed toward the animal during use for transferring the stimulus to the animal, the collar comprising: a collar housing for containing the stimulating unit and for supporting the electrodes, the collar housing having an inside surface designed for contacting the skin of the animal during use, the first electrode intersecting the inside surface at a first electrode base, and the second electrode intersecting the inside surface at a second electrode base; the inside surface having at least one high point surface extending above at least one of the first electrode base and the second electrode base and toward the animal during use; the at least one high point surface located outside of a central area of the housing, the central area located between the first electrode base and the second electrode base.

In other aspects, the connecting strap may include a buckle and the stretchable portion may be located in the buckle. The stretchable portion may be a flexible tubing made of polyvinyl chloride (PVC), thermoplastic elastomer (TPE), plastic, or latex. The buckle can be constructed to have a back buckle portion and a front buckle portion wherein the stretchable portion connects the back buckle portion to the front buckle portion. The buckle may also include a stop means for limiting the distance the stretchable portion can be stretched, and the stop means may be a string connected between the front buckle portion and the back buckle portion.

One advantage of the applicant's animal collar is that it reduces the load applied to the animal's neck by the stimulating electrodes or bark sensor. A further advantage of the applicant's animal collar is that it can be securely fastened to the neck of the animal without risk of causing discomfort or damage to the skin of the animal due to pressure from the

**4**

stimulating electrodes or sensor. Another advantage of the applicant's animal collar is that the stretchable portion of the connecting strap automatically adjusts the collar to the correct tightness regardless of the user's skill in securing the collar to the animal. Yet another advantage is that the stretchable portion of the connecting strap will extend and tighten in response to the animal's movements, such as flexing the neck muscles, heavy breathing or barking, thus maintaining proper collar tension and good electrode-skin contact at all times.

Further objects and advantages of the applicant's animal collar will be apparent from the following description, wherein various embodiments of the applicant's animal collar are clearly described and shown.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings that illustrate the applicant's animal collar by way of example:

FIG. **1** shows a front side view of an electronic animal collar of the prior art.

FIG. **2** shows an enlarged front side view of the electrodes and inside surface of the electronic animal collar of the prior art shown in FIG. **1**.

FIG. **3** is a perspective view of one embodiment of the applicant's animal collar showing attachment to a connecting strap and the location of side inserts in exploded fashion.

FIG. **4** is a front view of the applicant's animal collar, with side inserts installed, showing the location of pressure points and contact friction areas with the skin of the animal.

FIG. **5** is an enlarged front view of the electrodes and central high point surface of the collar shown in FIG. **4**.

FIG. **6** is a rear view of the applicant's animal collar showing the attachment of side inserts in exploded fashion.

FIG. **7** is an enlarged rear view of one of the electrodes shown in FIG. **6**.

FIG. **8** is an enlarged perspective view of one of the electrodes shown in FIG. **3**.

FIG. **9** is an enlarged front view of one of the electrodes of the applicant's animal collar, extending above a central high point surface of the collar.

FIG. **10** is a schematic view of a further embodiment of the applicant's animal collar including a receiver and a collar speaker, and a remote control unit including a microphone and a transmitter for transmitting audio commands to the animal.

FIG. **11** is a schematic view of another embodiment of the applicant's animal collar including an audio storage device for storage of audio commands.

FIG. **12** is a schematic view of another embodiment of the applicant's animal collar including a vibration sensor on the remote control unit.

FIG. **13** is a schematic view of another embodiment of the applicant's animal collar including voice recognition circuits and a microphone on the remote control unit.

FIG. **14** is a schematic view of another embodiment of the applicant's animal collar including an option control program and an advertising program on a microprocessor of the remote control unit.

FIG. **15** is a perspective view of a buckle attached to a connecting strap of another embodiment of the applicant's animal collar.

US 7,267,082 B2

5        6

DETAILED DESCRIPTION OF THE
INVENTION

FIG. **1** shows an electronic animal collar **1** common to the prior art and designed for attachment to the neck of an animal, such as a dog. Collar **1** typically has a boxlike collar housing **2** attachable by a connecting strap **3** to the neck of an animal, and supporting one or more electrodes or sensors **4** on a flat inside surface **5** thereof. Electrodes **4** make contact with the skin **6** of the animal at pressure points A and B when the collar I is attached to the animal's neck. Pressure points A and B also represent contact friction areas between the animal's skin **6** and collar housing **2**. The boxlike collar housing **2** contains the necessary electronic components for the proper functioning of the collar, including for example, a receiving unit for receiving electronic control signals, such as RF signals, from a remote transmitter, a power supply, and a stimulating unit for generating an electric stimulus, which is delivered to the animal through electrodes **4** in response to the received electronic control signals. In an electronic no-bark collar of the prior art, a bark sensor, similar to the one or more electrodes **4**, is used in place of the receiver/transmitter combination. The bark sensor detects vibrations due to barking and signals the stimulating unit to issue an electric stimulus to the animal through electrodes **4**.

FIG. **2** is an enlargement of the one or more electrodes or sensors **4** shown in FIG. **1**, illustrating that in the prior art the one or more electrodes or sensors **4** typically protrude above inside surface **5** between ⅜ inch (0.95 cm) and ¾ inch (1.9 cm).

FIGS. **3** through **9** illustrate one embodiment of the applicant's improved animal collar **10**, which is designed for attachment to the neck of an animal, such as a dog, using a connecting strap **20** and buckle **80** (see FIG. **3**). As in the prior art collar **1** shown in FIGS. **1** and **2**, collar **10** includes a collar housing **12** for containing a receiving unit **62** (see FIG. **10**), a stimulating unit **72** (see FIG. **12**), and a power supply (not shown). Depending on the various functions of collar **10**, collar housing **12** may also contain other devices, such as an audio storage device **68** (see FIG. **12**) and a collar speaker **60** (see FIGS. **6**, and **10-14**.) If collar **10** is a no-bark collar, collar housing **12** may not contain receiving unit **62**, but instead will include a bark sensor **90** (see FIG. **14**).

Collar housing **12** generally has a front surface **14**, an opposing back surface **15**, an outside surface **16**, which faces away from the animal during use, and an inside surface **18**, which faces inwards toward the animal and is designed for contacting the skin of the animal during use when the collar is attached to the animal's neck. Generally, collar housing **12** is contoured, as shown in FIG. **3**, to fit the curvature of the animal's neck, but one skilled in the art will appreciate that other configurations are possible so long as the improved supporting high point surfaces C, D, and E, as described herein below, are included.

One or more electrodes or sensors **24** extend through or are supported on inside surface **18**. For convenience, the applicant's animal collar is generally shown having two electrodes **24**, however, those skilled in the art will appreciate that more or fewer electrodes or sensors are possible. For example, a typical no-bark collar may have two electrodes **24** for delivering electric stimulation to the animal and one bark sensor **90** (see FIG. **14**), for sensing vibrations generated by barking, extending through or supported on inside surface **18**. In general, reference in this application to one or more electrodes shall include one or more sensors, such as bark sensors.

Referring specifically to FIGS. **7** and **8**, electrode **24** (or sensor **90** as the case may be) has an electrode base **26** located at the intersection of inside surface **18** and electrode **24**, a opposite distal tip **28** for making contact with the animal's skin **6**, and a central longitudinal axis **30**. As shown in FIG. **4**, electrodes **24** make contact with the skin **6** of the animal at pressure points A and B when collar **10** is attached to the animal's neck.

As shown graphically in FIG. **4**, inside surface **18** is designed to also make contact with the skin **6** of the animal during use, for example at high point surfaces C, D, and E. High point surfaces C, D, and E are raised portions of inside surface **18**, which extend inside surface **18** above electrode base **26** and towards the animal, so as to increase contact between inside surface **18** and the animal's skin **6** and to thereby relieve and distribute the load caused by collar tension around the animal's neck over a larger contact friction area than in the typical animal collar of the prior art (see FIG. **1**). This has two beneficial effects. First, animal comfort is improved and the possibility of developing sores is reduced because less pressure is concentrated on pressure points A and B. Second, collar movement is reduced due to the increased contact friction areas at high point surfaces C, D, and E of inside surface **18**. As a result, the collar stays in place on the animal's neck and good skin-electrode contact is maintained.

Good skin-electrode contact is further obtained and maintained by the applicant's animal collar, which directs the animal's skin **6** in the neck area, which is generally relatively loose, into pockets P separating high point surfaces C, D, and E, and electrodes or sensors **24**.

Referring to FIG. **7**, the one or more high point surfaces C, D, E, are raised portions of inside surface **18** extending above electrode base **26** and towards the animal and are designed to intersect with a notional **90**-degree plane **32** extended from any point X, above the level of electrode or sensor base **26**, along central longitudinal axis **30** of electrodes or sensors **24**, **90**.

In the prior art collar **1** shown in FIGS. **1** and **2**, inside surface **5** of collar housing **2** is flat and contains no high point surfaces that extend above an electrode or sensor base **26'** toward the animal during use. In the prior art collar of FIGS. **1** and **2**, there are no high point surfaces on inside surface **5** that will intersect with a notional 90-degree plane **32'** extended from any point X, above the electrode or sensor base **26'**, along a central longitudinal axis **30'** of electrodes or sensors **4**. In the prior art collars, most of the collar tensioning load is concentrated on the pressure points A and B of electrodes or sensors **4**.

The advantage of having one or more raised high point surfaces C, D, E, in the applicant's animal collar, is that these high point surfaces relieve the pressure applied to electrode pressure points A and B and distribute the collar tensioning load over a larger contact friction area, as shown in FIG. **4**, thus improving animal comfort and reducing the possibility of sores and injury. It also permits collar **10** to be secured to the animal with greater force so as to improve electrode-skin contact and minimize the possibility that the collar will shift as a result of animal movements.

The presence of one or more high point surfaces C, D, E, on inside surface **18**, regardless of their number or dimensions, will improve the performance of collar **10** when compared to the prior art collar **1**, where inside surface **5** is flat (see FIGS. **1** and **2**). Nevertheless, it is preferred that high point surfaces C, D, E, of inside surface **18** extend as high as possible relative to electrode base **26** and are as broad as possible, while at the same time permitting

7

8

adequate skin-electrode contact. As shown in FIG. **4**, the animal's skin **6** must be able to extend into pockets P formed between electrodes or sensors **24** and high point surfaces C, D, E.

Referring to FIG. **9**, the applicant has found it advantageous if collar housing **12** is designed so that the point X on longitudinal axis **30**, from which notional 90-degree plane **32** is extended, is located less than ⅜ inch (0.95 cm) down from distal end **28** of the one or more electrodes **24**. That is, distal end **28** of electrodes **4** should not extend above high point surfaces C, D, E by more than ⅜ inch (0.95 cm).

Referring to FIGS. **3** and **6**, inside surface **18** of collar housing **12** may include one or more flanged notches **40** designed to mate with oppositely flanged projections **42** on the bottom of wedge-shaped adjustment wings **44**. Adjustment wings **44** can be any suitable shape and are attached to collar housing **12** to raise the effective height of high point surfaces C, D, E on inside surface **18** relative to electrodes or sensors **24**, thereby increasing animal comfort when collar **10** is attached to the animal's neck. Adjustment wings **44** are used particularly when attaching collar **10** to animals having smaller radius necks. Depending on the size of the animal's neck, multiple adjustment wings **44** can be used to improve fit and comfort. Those skilled in the art will appreciate that other equivalent means of attaching adjustment wings **44** to collar housing **12** can be conceived and all such equivalent means are believed to be within the scope of the applicant's animal collar as described herein.

The applicant has found that one problem with existing electronic dog collars is attaining and maintaining sufficient contact between electrodes **24** and the animal's skin **6** (see FIG. **4**). If good electrode/skin contact is not maintained it results in an open circuit condition, which prevents transmission of the electric stimulus from the stimulating unit to the animal through electrodes **24**. Attempts have been made to solve this problem by using electronic methods, including using a low impedance transformer.

One cause of this problem in electronic dog collars is that many people are unable to properly tighten the collar to ensure good electrode/skin contact. Most people simply tighten the strap in the middle of the neck. However, since a dog's neck is generally larger at the base than at the top, when the dog runs the collar may move up causing a loss of good electrode/skin contact, resulting in an open circuit condition. Dog owners can solve this problem by tightening the strap around the smallest portion of the dog's neck, up under the ears of the dog. However, the problem with this solution is that, because such placement of the collar is uncomfortable for the dog, most owners are reluctant to attach the collar in this position.

A further cause of this problem with the conventional electronic dog collar, is that many people are unable to determine how tight the collar needs to be fitted to the animal to maintain sufficient electrode/skin contact. The collar needs to be tight enough to maintain good contact, but yet not so tight that the animal chokes. This is a difficult skill to master.

Yet another cause of this problem is that some dogs who have become accustomed to being fitted with electronic collars learn that if they expand their neck when the collar is being attached, all they need to do to avoid receiving a painful electric stimulus is contract their neck muscles at the appropriate time to break the electrode/skin contact.

To solve the problem of attaining and maintaining good electrode/skin contact in an electronic animal collar, to further improve collar comfort and versatility, and to avoid causing discomfort or choking the animal, connecting strap

**20** may include a stretchable elastic insert **50** (see FIG. **3**), which automatically adjusts collar **10** to the correct tightness regardless of the user's skill in securing the collar to the animal. One significant problem with electronic animal collars of the prior art results from the cone-like shape of the animal's neck, which is thicker at the body than at the head. When attaching the collar to the animal, users tend to slide the collar down and place it near the base of the animal's neck in the hope of there being less chance of the collar shifting downward further. Unfortunately, regular electronic collars attached in this manner will shift upwards on the animal's neck, becoming loose and may slide around to the side. Elastic insert **50** automatically adjusts for the cone shape of the animal's neck to maintain the correct electrode-skin contact and prevent the collar from shifting upward to a smaller diameter area of the neck. In addition, elastic insert **50** will extend and tighten in response to the animal's movements, such as flexing the neck muscles, heavy breathing or barking, thus maintaining proper collar tension and electrode-skin contact at all times. Elastic insert **50** may be made of any suitable elastic material having the desired stretch properties. The strength of elastic insert **50** must be sufficient to attain sufficient electrode/skin contact at the narrowest point of the animal's neck, but not so strong as to choke the animal during use.

In another embodiment of the applicant's animal collar, as shown in FIG. **15**, stretchable inserts **50***a* are located in the buckle **80** rather than in the strap **20** of electronic collar **10**. Buckle **80** is permanently secured to one end of strap **20** and is used in the standard manner to secure strap **20** and collar **10** around the animal's neck. In this embodiment, buckle **80** includes a back buckle portion **82** permanently secured to one end of strap **20** and a front buckle portion **84** for attachment to the other end of strap **20** in the usual manner. Front buckle portion **84** includes an anchor block **86** fixed to a front fork **88**. Anchor block **86** is pivotally attached to a buckle frame **90** including a buckle sleeve **92**, and a buckle pin **94** is pivotally attached to the buckle frame **92**. Back buckle portion **82**, includes a back fork **96** pivotally connected to one end of strap **20**. A strap ring **98** may also be attached to strap **20** at this point. Two stretchable inserts **50***a* are located between front fork **88** and back fork **96** to connect the back buckle portion **82** to the front buckle portion **84**, thus providing the correct amount of stretch in collar **10** to solve the above-described problem of attaining and maintaining good electrode/skin contact. Stretchable inserts **50***a* may be made of any suitable stretchable material having the desired stretch properties. As noted earlier, the strength of Stretchable inserts **50***a* must be sufficient to attain sufficient electrode/skin contact at the narrowest point of the animal's neck, but not so strong as to choke the animal during use or when the collar is moved to a thicker portion of the animal's neck.

The applicant has experimented with many different stretchable materials for connecting front buckle portion **84** to back buckle portion **82**, including braided elastic material, flat latex material, and rubber material. The applicant has found that flexible tubing made from Polyvinyl chloride (PVC), Thermoplastic Elastomer (TPE), plastic, or latex works particularly well. In particular, latex tubing having an inside diameter of 3/16 inches, manufactured by Kent Elastomer Products Inc. has been used by the applicant. The appropriate wall thickness of the tubing is selected so as to provide the desired amount of stretch. Such latex tubing over-comes the above-described problems by providing the correct amount of stretch to maintain good electrode/skin contact without causing the animal discomfort or to choke.

US 7,267,082 B2

9

The latex tubing is fixed to back fork **96** and front fork **88**, using a suitable adhesive. In some cases, depending on the inherent surface friction that may exist between forks **88**, **96** and the latex tubing, it may not be necessary to use any adhesive.

In the embodiment shown in FIG. **15**, the applicant has used two stretchable inserts **50***a* to connect the back buckle portion **82** to the front buckle portion **84**. The reader will appreciate that if the configuration of buckle **80** is altered slightly, it may be possible to use a single stretchable insert or more than two stretchable inserts in substitution for the two stretchable inserts **50***a* shown in FIG. **15**. Alternatively, a suitable spring or springs could be used, or a shock absorber device connected between back buckle portion **82** and front buckle portion **84**, would perform the same function.

In the embodiment shown in FIG. **15**, buckle **80** also includes a backup string **100** connected between front buckle portion **84** and back buckle portion **82**. Backup string **100** is cut to a desired length so as to limit or stop the total amount of stretch permitted for stretchable inserts **50***a* and can made from any lightweight, rigid, non-stretch material such as nylon. Once stretchable inserts **50***a* have been stretched a certain selected amount, backup string **100** will prevent further stretching, thereby limiting the amount of tension that can be placed on the collar when attaching it to the animal. This prevents an inexperienced owner from over tightening the collar and causing discomfort to the animal. Backup sting **100** will also prevent the collar from coming off the animal should the stretchable inserts **50***a* fail. The reader will appreciate that other suitable means can be substituted for backup string **100** and used to stop or limit the amount by which stretchable inserts **50***a* can be stretched. For example, a sliding telescopic bar could be connected between front buckle portion **84** and back buckle portion **82**. The sliding bar would permit only the desired amount of stretch before stopping further movement.

The stretchable inserts **50** and **50***a* described herein by the applicant are design specifically for use on electronic animal collars of the type having at least one electrode **24** extending toward the animal during use for transferring a stimulus to the animal. The electronic animal collar may have a housing for containing a stimulating unit for generating an electric stimulus, which is directed to the animal through the electrode or electrodes **24**. The housing may include a receiver unit for receiving signals from a transmitter to control when the stimulus is to be administered. Stretchable inserts **50** and **50***a* are designed to maintain good electrode/skin contact so as to improve the function of the electronic animal collar and provide comfort for the animal. Stretchable inserts **50** and **50***a* are not designed or intended for use on a regular animal collar used for attachment to a leash for restraining or leading the animal.

Referring to FIGS. **6**, **10** and **11**, collar speaker **60** may be included within collar housing **12** for use in issuing audio commands to the animal in response to signals received from a remote transmitter **64** contained within a remote control unit **65**. In one embodiment, a microphone **66** on remote control unit **65** picks up audio commands from a trainer. The commands are transmitted by transmitter **64** using permitted radio frequencies, received by receiver **62** contained within collar housing **12**, and played over collar speaker **60**. In an alternative preferred embodiment, as shown in FIG. **11**, collar housing **12** may include audio storage device **68**, such as an electronic memory chip, a micro recorder/player, or any similar device, containing pre-recorded audio commands or sounds familiar to the

10

animal. Instead of transmitting the actual audio, the trainer uses remote control unit **65** and transmitter **64** to send an activation code **69** corresponding to one of the pre-recorded audio commands or sounds contained within audio storage device **68**. Receiver unit **62** receives activation code **69** and causes the corresponding audio command or sound from storage device **68** to be played over collar speaker **60**.

In a further aspect of the applicant's animal collar, as shown in FIG. **12**, the above-described stored sounds, or an electric stimulus applied through electrodes **24**, can be activated simply by tapping or sharply striking remote control unit **65**. As a result, remote control unit **65** can be kept in the user's pocket and need not be removed for operation. This can be advantageous, for example, when hunting with a dog in the field where it may be raining or cold and the hunter does not want to carry remote control unit **65** in his hand, or remove a glove to activate the control unit buttons. It is also a safety feature, since it can be dangerous to handle both a gun and the remote control unit at the same time.

In this aspect of the applicant's animal collar, as shown in FIG. **12**, remote control unit **65** includes a vibration sensor **70** connected to a microprocessor **67** including memory. Vibration sensor **70** is capable of detecting when remote control unit **65** has been struck sharply or tapped by a user. In response to the tap, microprocessor **67** uses transmitter **64** to send an activation code **69** to receiver **62**, which initiates playback of one of the stored audio commands or sounds, or causes an electric stimulus to be sent from stimulating unit **72** to the animal through electrodes **24**. Vibration sensor **70** may be any suitable device capable of detecting vibrations produced by a sharp strike or tap of remote control unit **65**, such as an accelerometer, a piezoelectric crystal, or any device which measures strain wave propagation.

Microprocessor **67** can be programmed to send the appropriate activation code **69** for audio playback, or electric stimulus, depending on the number and sequence of taps detected by vibration sensor **70**. Remote control unit **65** may also include a means to prevent sending the activation code **69** upon accidental activation. For example, after detecting a tap, remote control unit **65** can be configured to issue a confirmatory signal, such as a sound tone or a voice reply or a vibration that the user can feel. Activation code **69** will not be sent until the user replies to the confirmatory signal with one or more taps within a specified period.

In an alternate embodiment of this aspect of the applicant's animal collar, as shown in FIG. **13**, vibration sensor **70** is replaced with voice recognition circuits **74** and microphone **66**. Upon receipt of the correct voice commands from the user the corresponding activation code **69** is sent to receiver **62**, which initiates playback of one of the stored audio commands or sounds or causes an electric stimulus to be sent from stimulating unit **72** to the animal through electrodes **24**.

In a further aspect of the applicant's animal collar, as shown in FIG. **14**, remote control unit **65** includes microprocessor **67** having an option control program **80**, which can be used to activate or deactivate features and components of collar **10** and remote control unit **65**. In this aspect of the applicant's animal collar, collar **10** and remote control unit **65** can be manufactured to include all of the features and components describe above, including bark sensor **90**, collar speaker **60**, receiver **62**, audio storage device **68**, stimulating unit **72**, electrodes **24**, vibration sensor **70**, microphone **66**, and voice recognition circuits **74**. Due to economies of scale, manufacturing large numbers of collars **10** and remote control units **65** containing all of these components can be

A55

US 7,267,082 B2

**11**             **12**

cost effective when compared to manufacturing smaller numbers of the devices containing differing combinations of components. At the time of purchase, the user simply identifies the desired features and pays the corresponding fee. The vendor enters an option code into remote control unit **65** corresponding to the desired features, and option control program **80** activates the corresponding components and controlling circuitry. The option code could be determined, for example, by the serial number of remote control unit **65** so that no two collars would have the same option code for the same features. For example, initially the user may not wish to purchase the no-bark feature of the collar, but may want to have the ability to control the collar by tapping remote control unit **65** or using voice commands. In this scenario, the vendor enters an option code into remote control unit **65** to active vibration sensor **70** or voice recognition circuits **74** (or both) permitting the user to control the collar by tapping remote control unit **65** or with voice commands.

One significant advantage of this aspect of the applicant's animal collar is that it gives the user considerable flexibility in his purchase. New features can be added by a user at any time by paying the appropriate fee and requesting the corresponding option code. In the above scenario, the user may later decide to add the no-bark feature by requesting and paying for the corresponding option code. The option code is entered into remote control unit **65** and transmitted to collar **10** to activate bark sensor **90**. To add further convenience, the option code may be provided to the user by telephone or over the Internet once payment is confirmed. One further advantage of this aspect of the applicant's animal collar is that a vendor no longer has to maintain an inventory of collars having different features and components. The vendor simply stocks one collar at the lowest price. If additional features are sold, the appropriate option codes are entered and additional fees are collected from the purchaser and paid to the manufacturer.

In another aspect of the applicant's animal collar, as shown in FIG. **14** as well, microprocessor **67** includes an advertising option program **95** and remote control unit **65** includes a display **96** for displaying advertising corresponding to the particular vendor selling the collar. Advertising option program **95** may be configured to cause certain advertising to appear in display **96** at a predetermined time or upon use of a selected feature. For example, at the beginning of duck hunting season, advertising option program **95** can cause the display of a coupon offering a discount on duck hunting products. The type of advertising displayed will be unique to each vendor and will be stored in the memory of microprocessor **67** at the time of manufacturer. At the time of shipping to a vendor, an advertising option code corresponding to that vendor is entered into microprocessor **67** to select the corresponding advertising for that vendor.

It will be appreciated by those skilled in the art that it is possible to design various configurations of the collar described herein that increase the contact friction areas between the collar and the animal, while at the same time maintaining good electrode-skin contact. Various such configurations have been illustrated herein by the applicant, but other such designs, that fall within the scope of the applicant's animal collar, as herein described by the applicant, are possible. It is therefore likely that the applicant's animal collar may be embodied in other specific forms without departing from the spirit or essential characteristics of the applicant's animal collar as described herein. The present embodiments are to be considered as illustrative and not restrictive, the scope of the applicant's animal collar being indicated by the appended claims rather than by the foregoing description, and all changes that come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.

I claim:

**1**. An animal collar designed for attachment to an animal, comprising:

a collar housing having an inside surface directed toward the animal during use;

a first electrode directed toward the animal during use, said first electrode intersecting said inside surface at a first electrode base; and

a second electrode directed toward the animal during use, said second electrode intersecting said inside surface at a second electrode base;

said inside surface having at least one high point surface extending above at least one of said first electrode base and said second electrode base and toward the animal during use;

said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.

**2**. The animal collar of claim **1**, wherein said at least one high point surface is comprised of one or more adjustment wings attachable to said inside surface.

**3**. The animal collar according to claim **1**, wherein said first electrode has a first electrode distal end opposite said first electrode base and extending toward the animal during use, and wherein said second electrode has a second electrode distal end opposite said second electrode base and extending toward the animal during use, and wherein said first electrode distal end and said second electrode distal end are no more than ⅜ inch (0.95 cm) closer to the animal during use than said at least one high point surface.

**4**. The animal collar according to claim **1**, wherein said collar housing is connected to a connecting strap adapted for attaching said collar to the animal.

**5**. The animal collar according to claim **4**, wherein said connecting strap includes an elastic portion for automatically adjusting collar tension during use.

**6**. The animal collar according to claim **1**, wherein said collar housing contains a receiver unit for receiving remote signals, and a stimulating unit for generating an electric stimulus for delivery through said at least one electrode upon receipt of said remote signals.

**7**. The animal collar according to claim **6**, wherein said collar housing further includes a speaker and an audio storage device for issuing pre-recorded audio commands to the animal in response to said remote signals.

**8**. The animal collar according to claim **6**, including a remote control unit comprising a transmitter, a vibration sensor, and a microprocessor, said vibration sensor adapted to detect when said remote control unit has been tapped sharply and said microprocessor adapted to use said transmitter to send said remote signals to said receiver in response to said sharp tap.

**9**. The animal collar according to claim **8**, wherein said microprocessor includes a confirmation means adapted to initiate a confirmatory signal when said vibration sensor detects that said remote control unit has been tapped sharply.

**10**. The animal collar according to claim **6**, including a remote control unit comprising a transmitter, voice recognition circuits, and a microprocessor, said voice recognition circuits adapted to receive and interpret voice commands from a user, and said microprocessor adapted to use said

A56

US 7,267,082 B2

**13**

transmitter to send said remote signals to said receiver in response to said voice commands.

**11**. The animal collar according to claim **8**, wherein said collar additionally includes a speaker and an audio storage device for issuing pre-recorded audio commands to the animal in response to said remote signals, and a bark sensor for detecting when the animal barks, and said remote control unit includes voice recognition circuits adapted to receive and interpret voice commands from a user, said microprocessor adapted to use said transmitter to send said remote signals to said receiver in response to said voice commands, said remote control unit including an option control program designed to activate or deactivate said vibration sensor, said voice recognition circuits, said audio storage device, and said bark sensor upon entry of an option code.

**12**. The animal collar according to claim **1**, including a remote control unit for sending electronic signals to said collar, said remote control unit including a display and an advertising option program, said advertising option program adapted for displaying advertising on said display.

**13**. The animal collar according to claim **12**, wherein said advertising to be displayed on said display is selected from a predetermined list of advertising contained within said remote control unit upon entry of an advertising code into said remote control unit.

**14**. The animal collar according to claim **1**, including a remote control unit, said animal collar and said remote control unit including one or more optional features, said remote control unit including an option control program designed to activate or deactivate said one or more optional features upon entry of an option code.

**15**. An animal collar designed for attachment to an animal, comprising:

a collar housing having an inside surface directed toward the animal during use;

a first electrode directed toward the animal during use, said first electrode intersecting said inside surface at a first electrode base, said first electrode having a first central longitudinal axis extending toward the animal during used from said first electrode base to an opposite first distal end; and

a second electrode directed toward the animal during use, said second electrode intersecting said inside surface at

**14**

a second electrode base, said second electrode having a second central longitudinal axis extending toward the animal during used from said second electrode base to an opposite second distal end;

said inside surface having at least one high point surface designed to intersect with a notional 90-degree plane extended from a point on at least one of said first central longitudinal axis and said second longitudinal axis;

said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.

**16**. The animal collar of claim **15**, wherein said at least one high point surface is comprised of one or more adjustment wings attachable to said inside surface.

**17**. An animal collar designed for attachment to an animal, the collar having a stimulating unit for generating a stimulus and first and second electrodes directed toward the animal during use for transferring the stimulus to the animal, the collar comprising:

a collar housing for containing the stimulating unit and for supporting the electrodes, said collar housing having an inside surface designed for contacting the skin of the animal during use, the first electrode intersecting said inside surface at a first electrode base, and the second electrode intersecting said inside surface at a second electrode base;

said inside surface having at least one high point surface extending above at least one of said first electrode base and said second electrode base and toward the animal during use;

said at least one high point surface located outside of a central area of said housing, said central area located between said first electrode base and said second electrode base.

**18**. The animal collar of claim **17**, wherein said at least one high point surface is comprised of one or more adjustment wings attachable to said inside surface.

\*    \*    \*    \*    \*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

This brief contains 7,373 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(&)B)(iii) and Federal Circuit Rule of Appellate Procedure 32(b). The word count was performed by the automated word-counting function of counsel's word processing software.

This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5,6). This brief has been prepared in a proportionally spaced typeface using LibreOffice in a 14 point "Century Schoolbook L" font.

Dated: May 6, 2015                    Respectfully submitted,

*/s/ Philip P. Mann*
Philip P. Mann

# United States Court of Appeals
# for the Federal Circuit

### 15-1311

-----------------------------------------------------------

Radio Systems Corp. and Innotek, INC.,

                                    Plaintiff – Appellee,

v.

TOM LALOR,

                                    Defendant – Appellant.

-----------------------------------------------------------

## <u>CERTIFICATE OF SERVICE</u>

Being duly sworn according to law, and being over the age of 18, upon my oath I depose and say that:

On the date indicated below, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 6, 2015                    */s/ Timothy J. Billick*

                                    Timothy J. Billick